131 Cal.Rptr.2d 575 (2003)
106 Cal.App.4th 1036
Elysa J. YANOWITZ, Plaintiff and Appellant,
v.
L'OREAL USA, INC., Defendant and Respondent.
No. A095474.
Court of Appeal, First District, Division Five.
March 7, 2003.
Rehearing Denied April 7, 2003.
Review Granted June 11, 2003.
*581 Herbert W. Yanowitz, San Francisco, for plaintiff and appellant.
Morgenstein & Jubelirer, William J. Carroll, David H. Bromfield, San Francisco, for defendant and respondent.
Certified for Partial Publication.[*]
GEMELLO, J.
Plaintiff Elysa J. Yanowitz was a regional sales manager for defendant L'Oreal USA, Inc. (L'Oreal), a cosmetics and fragrance company. A male L'Oreal executive ordered Yanowitz to fire a female employee in her region because the executive found the employee insufficiently attractive. Yanowitz was asked to get him someone "hot" instead. She asked for a better reason. The executive and another executive, who was Yanowitz's immediate supervisor, subjected her to heightened scrutiny and increasingly hostile evaluations over the ensuing months. Within four months, Yanowitz went on stress leave, and her position was eventually filled.
Yanowitz brought suit under the Fair Employment and Housing Act, charging L'Oreal with unlawful retaliation, and presented evidence that, if believed, would demonstrate the conduct described. The trial court granted summary judgment, finding that Yanowitz had not engaged in any protected activity. We reverse.
A male executive's order to fire a female employee because she fails to meet the executive's standards for sexual attractiveness is an act of sex discrimination when no similar standards are applied to men. A lower-level manager's refusal to carry out that order is protected activity, and an employer may not retaliate against her for *582 that refusal. We remand for further proceedings on Yanowitz's retaliation claim.

FACTUAL AND PROCEDURAL BACKGROUND
This is an appeal from a grant of summary judgment. Accordingly, we must accept as true the facts shown by plaintiffs evidence, granting her the benefit of all reasonable inferences. (Hersant v. Department of Social Services (1997) 57 Cal. App.4th 997, 1001, 67 Cal.Rptr.2d 483 (Hersant).)
Elysa Yanowitz joined L'Oreal's predecessor in 1981.[1] She was promoted from sales representative to regional sales manager for Northern California and the Pacific Northwest in 1986. At one time or another, Yanowitz's region included stores in California, Oregon, Washington, Idaho, Alaska, Hawaii, Arizona, Utah, Colorado, Texas, and Minnesota. Yanowitz was responsible for managing L'Oreal's sales force and dealing with accounts, i.e., department and specialty stores that sold L'Oreal's fragrances.
During her first 10 years as a regional sales manager, Yanowitz's performance was consistently reviewed as "Above Expectation" and in some instances fell just short of "Outstanding," the highest possible rating. In early 1997, Yanowitz was named L'Oreal's Regional Sales Manager of the Year for her performance during 1996. She received a Cartier watch and a congratulatory note complimenting her on her ability to inspire team spirit and her demonstration of leadership, loyalty, and motivation.
Yanowitz worked in the company's European Designer Fragrance Division. In the fall of 1997, that division and the Ralph Lauren Fragrance Division merged. While some regional sales managers were laid off, L'Oreal retained Yanowitz and increased her responsibilities. Yanowitz assumed responsibility for marketing Ralph Lauren fragrances in her region, as well as managing L'Oreal's Ralph Lauren sales force.
Shortly after the restructure, John (Jack) Wiswall, general manager for the new Designer Fragrance Division, and Yanowitz toured the Ralph Lauren installation at a Macy's store in San Jose. After the tour, Wiswall told Yanowitz there needed to be a change because the female sales associate was "not good looking enough." Wiswall instructed Yanowitz to have the sales associate fired, and directed her to "[g]et me somebody hot," or words to that effect.
On a return trip to the store, Wiswall discovered that the sales associate had not been dismissed. He reiterated to Yanowitz that he wanted the associate fired and complained that she had not done so. He passed "a young attractive blonde girl, very sexy," on his way out, turned to Yanowitz, and told her, "God damn it, get me one that looks like that." The sales associate, in contrast, was dark-skinned. Yanowitz asked Wiswall for an adequate justification before she would fire the associate.
Yanowitz never carried out Wiswall's order. Wiswall asked her whether the associate had been dismissed on several subsequent occasions. Yanowitz again asked Wiswall to provide adequate justification for dismissing her. Yanowitz never complained to the Human Resources Department (Human Resources), nor did she tell Wiswall that his order was discriminatory; he was her boss, and she did not want to inflame him.
*583 In March 1998, Yanowitz learned that the sales associate was among the top sellers of men's fragrances in the Macy's West chain. Also in March 1998, a member of Yanowitz's sales force learned that Wiswall had issues with Yanowitz and now wanted to get rid of her.
Richard (Dick) Roderick, the vice president in charge of designer fragrances, was Yanowitz's immediate supervisor and reported directly to Wiswall. Roderick and Wiswall were in New York, while Yanowitz was based in San Francisco. In April 1998, Roderick began soliciting negative information about Yanowitz from her subordinates. Roderick called Christine De-Gracia, who reported to Yanowitz, and asked her about any "frustrations" she had with Yanowitz. When DeGracia said she had had some, Roderick asked her to hold her thoughts so that the matter could be discussed with Human Resources. Roderick and the division head for Human Resources, Jane Sears, then called DeGracia back to discuss those issues. Roderick asked DeGracia if any others were having problems with Yanowitz; DeGracia did not provide any names. Two weeks later, Roderick called DeGracia again and told her it was urgent that she help him get people to come forward with their problems about Yanowitz. In early June 1998, Roderick again asked DeGracia to notify him of negative incidents involving Yanowitz.
On May 13, 1998, Roderick summoned Yanowitz to New York. He opened the meeting by asking whether she thought she had been brought in to be fired, then criticized Yanowitz for her "dictatorial" management style. He closed the meeting by saying, "It would be a shame to end an eighteen-year career this way." During May and June 1998, Roderick and Wiswall obtained Yanowitz's travel and expense reports and audited them.
In June 1998, Yanowitz met with Wiswall, Roderick, and various account executives and regional sales managers responsible for the Macy's account. Wiswall screamed at Yanowitz, told her he was "sick and tired of all the fuckups" on the Macy's account, and said that Yanowitz could not get it right.
On June 22, 1998, Yanowitz wrote Roderick, advising him that her Macy's West team was disturbed about certain issues. Wiswall, who had been copied, wrote a note to Roderick on Yanowitz's memo: "Dick  She is writing everything! Are you!!!???" One week after Wiswall's note, Roderick prepared three memos to Human Resources documenting the meeting with Yanowitz on May 13, 1998, a conversation with DeGracia on June 4, 1998, and a visit to Yanowitz's market in early June 1998. These memos were critical of Yanowitz; the memo concerning the May 13 meeting criticized Yanowitz for being too assertive.
On July 16, 1998, Roderick prepared a more elaborate memorandum and delivered it to Yanowitz. The memorandum criticized Yanowitz's handling of a Polo Sport promotion, a Picasso promotion, coordination of advertising with others, handling of the Sacramento market, and the length of a March 1998 business trip to Hawaii. Roderick closed, "I have yet to see evidence that you took [the May 13] conversation seriously and made the necessary style modifications. [¶] Elysa, I am quite surprised that a person with so many years of experience and so many years with Cosmair could become so ineffective so quickly. [¶] Our business is changing daily and we all must learn to adapt to those changes or we will fail as individuals and as a company. Your changes must start immediately. [¶] I expect a reply to this memo within one week of receipt."
*584 Yanowitz viewed the memorandum as an expression of intent to develop pretextual grounds and then terminate her. She suggested the parties meet to discuss a severance package, but also indicated that she wanted to prepare her written response to the July 16,1998, memorandum first.
Carol Giustino, the Human Resources director, set up a meeting for July 22 and rejected Yanowitz's request that the meeting be postponed. Giustino also denied Yanowitz's request to have her attorney-husband present. During the meeting, Roderick and Giustino questioned Yanowitz about the accusations in the July 16 memorandum without reading her written response. Yanowitz broke down in tears. During the meeting, Roderick imposed a new travel schedule on Yanowitz, a schedule that regulated precisely how often she should visit each market in her territory. Two days after the meeting, Yanowitz went out on disability leave due to stress. She did not return, and L'Oreal replaced her in November 1998.
Yanowitz filed a discrimination charge with the Department of Fair Employment and Housing (DFEH) on June 25, 1999. She alleged that L'Oreal had discriminated against her on the basis of sex, age (Yanowitz was 53), and religion (Yanowitz is Jewish). She also alleged that L'Oreal had retaliated against her for refusing to fire the female employee Wiswall considered unattractive.
After receiving a right-to-sue letter, Yanowitz sued L'Oreal. The first amended complaint, filed on September 13, 1999, included claims for age and religious discrimination and retaliation under the Fair Employment and Housing Act (FEHA), violation of the Unfair Competition Law (UCL), and breach of the covenant of good faith and fair dealing. The second amended complaint, filed July 21, 2000, added a cause of action for negligent infliction of emotional distress.
L'Oreal filed two separate motions for summary adjudication. The first challenged Yanowitz's FEHA and emotional distress claims, which each arose from L'Oreal's conduct toward Yanowitz in 1998. The second challenged Yanowitz's UCL and good faith and fair dealing claims, which each arose from an unrelated L'Oreal practice of selling product to distributors other than its primary distributors, high-end department stores and specialty stores. Each motion was ultimately granted, and judgment was entered on April 25, 2001.[2]
Yanowitz has timely appealed.

DISCUSSION

I. Summary Judgment

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary adjudication of a cause of action must show either that one or more elements of the cause of action cannot be established or that there is a complete defense. "[A]U that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action. . . . [T]he defendant need not himself conclusively negate any such element. . . ." (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853, 107 Cal.Rptr.2d 841, 24 P.3d 493, fn. omitted.) If that burden is met, the *585 burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); Silva v. Lucky Stores, Inc. (1998) 65 Cal. App.4th 256, 261, 76 Cal.Rptr.2d 382.)
We review a summary judgment motion de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (Galanty v. Paul Revere Life Ins. Co. (2000) 23 Cal.4th 368, 374, 97 Cal.Rptr.2d 67, 1 P.3d 658; Rodeo Sanitary Dist. v. Board of Supervisors (1999) 71 Cal.App.4th 1443, 1446, 84 Cal.Rptr.2d 601; Code Civ. Proc., § 437c, subd. (c).) We are not bound by the trial court's stated reasons or rationales. (Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 805, 85 Cal.Rptr.2d 459 (Horn).) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (Lenane v. Continental Maritime of San Diego, Inc. (1998) 61 Cal.App.4th 1073, 1079, 72 Cal.Rptr.2d 121.) Thus, we apply the same three-step analysis used by the trial court: "We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue. [Citation.]" (Silva v. Lucky Stores, Inc., supra, 65 Cal.App.4th at p. 261, 76 Cal.Rptr.2d 382.)
"In reviewing a motion for summary judgment, we accept as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party. In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn therefrom are accepted as true." (Hersant, supra, 57 Cal.App.4th at p. 1001, 67 Cal.Rptr.2d 483.) Summary judgment is a drastic remedy to be used sparingly, and any doubts about the propriety of summary judgment are to be resolved in favor of the opposing party. (Kulesa v. Castleberry (1996) 47 Cal.App.4th 103, 112, 54 Cal. Rptr.2d 669; WYDA Associates v. Merner (1996) 42 Cal.App.4th 1702, 1709, 50 Cal. Rptr.2d 323.)

II. Unlawful Retaliation Under FEHA

Yanowitz has not appealed the summary adjudication of her sex, age and religious discrimination claims. We consider only her claim for unlawful retaliation.
Government Code section 12940, subdivision (h), makes it an unlawful employment practice for any employer to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this [Act] or because the person has filed a complaint, testified, or assisted in any proceeding under this [Act]."
The general summary judgment standard of review is modified for an FEHA retaliation claim. In employment discrimination and retaliation cases, California courts have adopted the burdens and order of proof developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 for evaluating claims under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII). (Soda v. Robert F. Kennedy Medical Center (1997) 56 Cal. App.4th 138, 155-156, 65 Cal.Rptr.2d 112 (Sada).) Evaluating an employee retaliation case for purposes of summary judgment requires a three-step process. The burden of proof shifts at each step of the process. (Id. at pp. 149-151, 155, 65 Cal. Rptr.2d 112.)
*586 First, the employee must make out a prima facie case of retaliation. (Soda, supra, 56 Cal.App.4th at p. 155, 65 Cal.Rptr.2d 112.) This requires proof of three elements: the employee "must show that [she] engaged in a protected activity, [the] employer subjected [her] to adverse employment action, and there is a causal link between the protected activity and the employer's action." (Flait v. North American Watch Corp. (1992) 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d 522 (Flait).) Second, if the employee meets this burden, the burden shifts to the employer to articulate a legitimate nonretaliatory reason for any adverse employment action. (Sada, supra, 56 Cal.App.4th at p. 155, 65 Cal. Rptr.2d 112.) Finally, after the employer produces a legitimate business justification, the employee must produce substantial responsive evidence that demonstrates the employer's reason for the adverse employment action was untrue or pretextual, or evidence that the employer acted with a retaliatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in unlawful retaliation. (See Horn, supra, 72 Cal.App.4th at pp. 806-807, 85 Cal.Rptr.2d 459; Hersant, supra, 57 Cal.App.4th at pp. 1004-1005, 67 Cal.Rptr.2d 483.)
This burden-shifting approach offers an employer two ways to obtain summary judgment: either by showing a failure of a part of the employee's prima facie case, or by presenting unrebutted evidence of a nonpretextual justification for its actions. "If the employer presents admissible evidence either that one or more of plaintiffs prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." (Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448.)
On appeal, L'Oreal has chosen both approaches, attacking each prong of Yanowitz's prima facie case as well as her showing of pretext. We consider these arguments in turn.

A. Protected Activity
Evidence before the trial court established the following facts, undisputed by either side. In the fall of 1997, Jack Wiswall, Yanowitz's superior, ordered Yanowitz to have a female sales associate at a Macy's West store in her region fired. As justification, Wiswall explained that the associate "was not good looking enough." The associate had dark skin; Wiswall preferred fair-skinned blondes. Wiswall told Yanowitz, "Get me somebody hot," or words to that effect. Yanowitz did not carry out Wiswall's order. When Wiswall asked her whether the associate had been dismissed on subsequent occasions, Yanowitz requested adequate justification for firing her. Yanowitz did not complain to Human Resources, nor did she tell Wiswall that his order was discriminatory.
The trial court found that on these facts, Yanowitz had failed to establish she engaged in any protected activity. On appeal, L'Oreal argues that Yanowitz's actions are not protected because physical appearance is not a protected category under FEHA and because Yanowitz failed to expressly complain.
L'Oreal's argument misframes the first issue. The issue is not whether physical appearance is a protected category. Though protection against discrimination on this basis has been suggested,[3] the *587 FEHA does not proscribe discrimination on the basis of appearance.[4] While courts have interpreted another antidiscrimination statute, the Unruh Civil Rights Act (Civ. Code, § 51), to proscribe discrimination on many bases not expressed in the statute (Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142, 1155, 278 Cal.Rptr. 614, 805 P.2d 873)  including physical appearance (In re Cox (1970) 3 Cal.3d 205, 217-218, 90 Cal.Rptr. 24, 474 P.2d 992)  no such latitude exists with regard to the FEHA (Esberg v. Union Oil Co. (2002) 28 Cal.4th 262, 268-270, 121 Cal.Rptr.2d 203, 47 P.3d 1069). We are not free to read into the FEHA a category not included by the Legislature, and we do not address whether Wiswall's order was prohibited physical appearance discrimination. Instead, the issue is one of sex discrimination: May a male executive insist that a female subordinate be terminated because she is not sexually appealing to him, when no similar orders are issued with respect to male employees?
Sex discrimination in the workplace comes in many guises. In a most basic form, it involves outright exclusion of women, solely by reason of their sex. Even where women have gained access to the workplace, sex discrimination may persist in other forms, for example, through identification of particular jobs as "man-only" or "woman-only" jobs, through perpetuation of a glass ceiling that ensures women will only rise so high on the corporate ladder, or through the unwritten establishment of two sets of rules for success: for men, based on performance, and for women, based on appearance.
The notion that an employer may not insist on only attractive women employees has long been established. In Wilson v. Southwest Airlines Co. (N.D.Tex.1981) 517 F.Supp. 292 (Wilson),[5] for example, Southwest Airlines defended its policy that only attractive women could be hired as flight attendants and ticket agents. Southwest argued that female sex appeal was a bona fide occupational qualification (BFOQ) under Title VII because it wanted to project a "sexy image and fulfill its public promise to take passengers skyward with `love.'" (Wilson, supra, 517 F.Supp. at p. 293.) Because Southwest was not in a business where "vicarious sex entertainment is the primary service provided," the district court rejected Southwest's defense. (Id. at p. 302.)
Nor is it permissible to hire both men and women, but then subject women to more severe and burdensome appearance standards. (Frank v. United Airlines, Inc. (9th Cir.2000) 216 F.3d 845, 854-855 (Frank); Gerdom v. Continental Airlines, Inc. (9th Cir.1982) 692 F.2d 602, 608 (en banc); Association of Flight Attendants v. Ozark Air Lines (N.D.Ill.1979) 470 F.Supp. 1132, 1135; Laffey v. Northwest Airlines, Inc. (D.D.C.1973) 366 F.Supp. 763, 790.) The federal courts have consistently recognized that "[a] sex-differentiated appearance standard that imposes unequal burdens on men and *588 women is disparate treatment that must be justified as a BFOQ." (Frank, supra, 216 F.3d at p. 855.) In Frank, plaintiffs challenged an employer's weight regulations, regulations that applied to male and female employees but imposed significantly greater burdens on women, requiring them to be comparatively much thinner. (Id. at p. 854.) The Ninth Circuit reversed a grant of summary judgment under both Title VII and the FEHA because of the employer's disparate treatment of its male and female employees' appearance. (Id. at p. 855 & fn. 10.)
Just as an employer may not impose broad rules that regulate men and women differently based on their appearance or sexual desirability, so an employer may not discriminate against specific individuals on these bases. For example, in Priest v. Rotary (N.D.Cal.1986) 634 F.Supp. 571, an employer demoted a cocktail waitress who refused to wear sexually suggestive attire. The court recognized this as unlawful sex discrimination. (Id. at p. 581.) Similarly, in E.E.O.C. v. Sage Rlty. Corp. (S.D.N.Y.1981) 507 F.Supp. 599, the employer insisted that a female office building lobby attendant wear a sexually revealing uniform. When the employee refused, she was dismissed. The court concluded that the employee was required to wear the revealing uniform because she was a woman, and that she had made out a prima facie case of sex discrimination. (Id. at pp. 607-608.)
We find Wiswall's actions analogous. An explicit order to fire a female employee for failing to meet a male executive's personal standards for sexual desirability is sex discrimination. Yanowitz's evidence permits the inference that Wiswall would not have ordered the employee fired if she had been a man, simply because a man's physical attractiveness would not have been an issue. Moreover, we note that Yanowitz did not have to prove that Wiswall's order was discriminatory; she needed only to show a good faith, reasonable belief that it was. (Flait, supra, 3 Cal. App.4th at p. 477, 4 Cal.Rptr.2d 522.) She did so here.
L'Oreal argues that several federal courts have reached a contrary conclusion. (Malarkey v. Texaco, Inc. (2d Cir.1983) 704 F.2d 674, 675 (Malarkey); Alam v. Reno Hilton Corp. (D.Nev.1993) 819 F.Supp. 905, 913 (Alam).) We do not find these cases helpful. In Malarkey, plaintiff alleged that she was discriminated against on the basis of sex because the employer evaluated women according to their appearance, not their performance. The district court dismissed the complaint absent evidence of the standards that were applied to men, and the Court of Appeal affirmed without any analysis. (Malarkey, supra, 704 F.2d at p. 675.) Given Malarkey 's lack of analysis, we find it of little assistance. Moreover, Yanowitz has provided evidence that she was never asked, by Wiswall or anyone else at L'Oreal, to dismiss men for being insufficiently "hot." Alam relied on Malarkey to reject a discrimination claim based on an employer's selectively choosing "Barbie doll" types for certain positions. (Alam, supra, 819 F.Supp. at pp. 912-913.) Both men and women were hired; plaintiffs complained that attractive men and women were hired over unattractive men and women. (Ibid.) Alam thus involved a pure physical appearance discrimination claim, rather than a sex discrimination claim.
L'Oreal argues that Yanowitz's claim still must fail because Yanowitz failed to alert L'Oreal that its actions were discriminatory. L'Oreal relies on various cases holding that an unarticulated belief that discrimination has occurred does not constitute protected activity. (See, e.g., Allen v. Denver Public School Bd. (10th *589 Cir.1991) 928 F.2d 978, 985; Booker v. Brown & Williamson Tobacco Co., Inc. (6th Cir.1989) 879 F.2d 1304, 1313; Garcia-Paz v. Swift Textiles, Inc. (D.Kan. 1995) 873 F.Supp. 547, 559-560; Aldridge v. Tougaloo College (S.D.Miss.1994) 847 F.Supp. 480, 484-485.) These cases deal with retaliation for filing a grievance or otherwise complaining in a manner that fails to alert the employer to the employee's belief that discrimination has occurred. Without notice, the employer has no opportunity to investigate and take remedial action against the perpetrator, if necessary, nor any reason to suspect that the employee's complaints should be insulated from discipline. In the context of grievances, federal courts properly have imposed a notice requirement.
That requirement does not apply to this case, which is not a grievance case. Here, an employer directed an employee to engage in discriminatory conduct, conduct for which the employer has offered no legitimate business purpose. The refusal to carry out a discriminatory order is protected whether or not the employee explains to the employer the unlawfulness of the conduct. (See McDonnell v. Cisneros (7th Cir.1996) 84 F.3d 256, 262 [under Title VII, "passive resistance" through refusal to carry out unlawful order is protected activity]; EEOC Compliance Manual Section 8, "Retaliation," p. 8-5 (1998) ["Refusal to obey an order constitutes protected opposition if the individual reasonably believes that the order requires him or her to carry out unlawful employment discrimination"].) The refusal to obey such an order is the very conduct the FEHA seeks to encourage. (Gov.Code, § 12920 ["It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation"].)
Part of the rationale behind this distinction between grievances and refusals to discriminate lies in the concept of constructive notice. Employers, like any citizen, are charged with knowledge of the law. An employer issuing an unlawful order may fairly be charged with notice that the order is unlawful; it is not the employee's burden to educate the employer. Accepting Yanowitz's evidence as true, we are not presented with a case in which the order given was lawful, but was refused because of a good faith and reasonable (albeit mistaken) belief that it violated the law. In such a case, an employer would have no constructive notice, and the burden would be on the employee to articulate that she believed the order was unlawful before any protection against retaliation would attach. Similarly, when an employee files a grievance, the burden is on the employee to specify what it is she is complaining about, whether it be concerns over discrimination or generic unfairness. The employer cannot be presumed to know that any given complaint arises out of concerns over discrimination.
On these facts, we find no notice barrier for a second reason as well: Yanowitz's objections gave L'Oreal actual notice. "Both the state and federal statutes are designed to foster open communication between an employer and its employees regarding perceived misconduct, encouraging employees to call their employers' attention to unlawful practices of which the employer might be unaware and which might result in litigation if not voluntarily changed." (Flait, supra, 3 Cal. App.4th at p. 476, 4 Cal.Rptr.2d 522.) This notification function is satisfied *590 where, as here, the discriminatory order comes from the employer's high-level executive, and the employee tells the executive that he must provide a better justification. Under FEHA, as under Title VII, the knowledge of managerial-level employees is imputed to the employer under traditional agency principles. (See Birschtein v. New United Motor Manufacturing, Inc. (2001) 92 Cal.App.4th 994, 1007, 112 Cal. Rptr.2d 347 (Birschtein).) This is not a case in which L'Oreal management was unaware of the unlawful practice.
L'Oreal contended at oral argument that Yanowitz should have objected more vigorously to Wiswall, or complained to the Human Resources manager of her division  who it conceded reported to Wiswall. Such a complaint would have been futile. Wiswall already knew of the discriminatory order, because he issued it, and when Yanowitz asked Wiswall for a better justification before she would carry out his order, Wiswall persisted. In essence, this argument seeks to place on the employee the burden of educating management about the discriminatory nature of its actions. According to L'Oreal, if an employee fails to confront her employer and instead passively refuses to engage in discrimination, the employer may retaliate against her without incurring liability. We do not read the FEHA to allow such retaliation. The FEHA affords remedies to those who are subjected to discrimination, it provides recourse against those who engage in discrimination, and it offers protection to those who refuse to carry out discrimination. The FEHA imposed on Yanowitz a duty not to subject others to discrimination, and she fulfilled that duty. L'Oreal cannot punish Yanowitz for refusing to carry out Wiswall's order.

B. Adverse Action
L'Oreal argues that Yanowitz was not subjected to any "adverse action" because L'Oreal did not materially alter the terms of her employment. The trial court agreed. On appeal, the parties disagree over the scope of L'Oreal's conduct that may be used to show an adverse action. L'Oreal contends that Yanowitz is limited by the doctrine of administrative exhaustion and the statute of limitations to actions taken in July 1998. The parties also disagree about what constitutes an adverse action under the FEHA. We consider each of these issues in turn.

1. Administrative Exhaustion
Yanowitz filed a DFEH charge on June 25, 1999. In that charge, she contended that L'Oreal had discriminated against her on the basis of age, sex, and religion, and retaliated against her for protesting sexual discrimination. She listed the dates of the acts as July 16 and July 22, 1998. No space on the form allowed room to expand on the details of these allegations.
L'Oreal argues that Yanowitz's showing of an adverse action should be confined to the July 16 Roderick memorandum and the July 22 meeting because these are the only dates given on the DFEH charge. According to L'Oreal, Yanowitz has failed to exhaust her administrative remedies as to all other earlier conduct. This is a misapplication of the FEHA exhaustion doctrine.
A cause of action asserting employment practices in violation of the FEHA will only lie if the plaintiff has exhausted the FEHA's administrative remedies. (Martin v. Lockheed Missiles & Space Co. (1994) 29 Cal.App.4th 1718, 1724, 35 Cal.Rptr.2d 181; Accardi v. Superior Court (1993) 17 Cal.App.4th 341, 349, 21 Cal.Rptr.2d 292.) Before suing, the claimant must file an administrative complaint with the DFEH (Gov.Code, § 12960) *591 and obtain the DFEH's notice of right to sue (id., § 12965, subd. (b)). (Martin v. Lockheed Missiles & Space Co., supra, 29 Cal.App.4th at p. 1724, 35 Cal.Rptr.2d 181.) To effectively exhaust remedies, the administrative complaint must have been filed within one year after the alleged unlawful employment practice occurred. (Gov.Code, § 12960.) "`[T]he failure to exhaust an administrative remedy is a jurisdictional, not a procedural, defect,' and . . . failure to exhaust administrative remedies is a ground for a defense summary judgment." (Martin v. Lockheed Missiles & Space Co., supra, 29 Cal.App.4th at p. 1724, 35 Cal.Rptr.2d 181.)
One test of the "scope" of an administrative complaint for purposes of exhaustion is whether "`an investigation of what was charged in the [administrative complaint] would necessarily uncover'" the additional incidents alleged in the civil action. (Soldinger v. Northwest Airlines, Inc. (1996) 51 Cal.App.4th 345, 381, 58 Cal.Rptr.2d 747 (Soldinger), quoting Okoli v. Lockheed Technical Operations Co. (1995) 36 Cal.App.4th 1607, 1615, 43 Cal. Rptr.2d 57.) The purpose underlying the administrative charge requirement is to "`trigger the investigatory and conciliatory procedures of the'" responsible administrative agency. (Okoli v. Lockheed Technical Operations Co., supra, 36 Cal. App.4th at p. 1615, 43 Cal.Rptr.2d 57.) If the investigation of what was charged would lead to discovery of other uncharged incidents, that purpose has been served and the other incidents can be included in a subsequent civil suit. (Ibid.)
Soldinger demonstrates this principle. There, an employee filed a charge alleging religious discrimination in April 1991, received a right-to-sue letter in April 1991, and filed suit in April 1992. In June 1993, she filed a second charge, alleging "retaliation for `filing a previous charge of discrimination,'" and received a second right-to-sue letter. She subsequently amended her complaint to add a retaliation cause of action and alleged acts of retaliation dating back to March 1992. (Soldinger, supra, 51 Cal.App.4th at p. 380, 58 Cal.Rptr.2d 747, italics omitted.) The employer argued that the employee had failed to exhaust her administrative remedies because her administrative charge did not include every act of retaliation alleged in the amended lawsuit. (Id. at pp. 381-382, 58 Cal. Rptr.2d 747.) The court rejected this argument. It held that a DFEH investigation of the charge of retaliation inevitably would have revealed the acts included in the amended complaint, which had all occurred or were ongoing as of the filing of the second charge. Therefore, the second charge adequately exhausted all acts allegedly supporting the employee's retaliation claim. (Ibid.)
Soldinger is directly on point. Though Yanowitz's charge did not identify every individual act of retaliation, it asserted that L'Oreal had retaliated against her "for failure to bring about [the] termination of [a] female employee not considered physically attractive by corporate General Manager." An investigation of this charge would have addressed the various acts through July 1998 that Yanowitz contends constituted retaliation. Her charge fulfilled the purposes underlying the exhaustion requirement, and Yanowitz is not barred from relying on L'Oreal's course of conduct in the spring and summer of 1998.

2. Statute of Limitations for Continuing Course of Conduct

In the alternative, L'Oreal argues that Yanowitz is barred from basing her retaliation claim on incidents more than one year before her June 25, 1999, DFEH charge. Subject to certain exceptions, under the FEHA, an administrative complaint *592 must be filed with the DFEH within one year from the date of the occurrence of the alleged unlawful practice or within 90 days thereafter if the plaintiff first discovered the facts of the unlawful practice after expiration of the one-year period. (Gov.Code, § 12960; see Williams v. City of Belvedere (1999) 72 Cal.App.4th 84, 90, 84 Cal.Rptr.2d 658.) We reject this argument because Yanowitz's evidence permits the inference that L'Oreal's conduct was part of a continuous course of retaliatory conduct.
The continuing violation doctrine "allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period." (Richards v. CH2M Hill, Inc. (2001) 26 Cal.4th 798, 802, 111 Cal.Rptr.2d 87, 29 P.3d 175 (Richards).) In Richards, a case involving disability claims under the FEHA, the California Supreme Court held that an employer's series of unlawful actions in such a case "should be viewed as a single, actionable course of conduct if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they have not acquired a degree of `permanence' so that employees are on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile." (Ibid.) Recently, Division Four of this court used the Richards formulation to evaluate the timeliness of sexual harassment and retaliation claims, noting that Richards was equally applicable in other "FEHA workplace discrimination litigation." (Birschtein, supra, 92 Cal.App.4th at pp. 1004-1005, 112 Cal.Rptr.2d 347.)[6]
Applying this test at the summary adjudication stage, we hold that a reasonable jury could conclude that the criticisms Yanowitz received, the memos that were written about her, and the inquiries to subordinates seeking negative feedback were all part of a single course of conduct designed to punish her for her inaction on Wiswall's request. A jury could conclude that these actions were similar in kind, closely connected temporally, and had not culminated in a permanent act  such as dismissal  that would have put Yanowitz on notice that further conciliatory efforts would be futile. (See Valdez v. City of Los Angeles (1991) 231 Cal.App.3d 1043, 1050-1051, 282 Cal.Rptr. 726 [summary judgment inappropriate where application of continuing violation doctrine hinges on factual issues].) Consequently, Yanowitz is not barred from relying on pre-June 25, 1998, acts at this stage when trying to prove adverse action.

3. Definition of "Adverse Action"

We turn to the definition of what constitutes an adverse action under the FEHA. There is a paucity of authority. The FEHA does not define the kind of adverse employment action required for a retaliation claim. Only two published cases have addressed the question. (Thomas v. Department of Corrections (2000) 77 Cal. App.4th 507, 510-512, 91 Cal.Rptr.2d 770 *593 (Thomas); Akers v. County of San Diego (2002) 95 Cal.App.4th 1441, 1454-1455, 116 Cal.Rptr.2d 602 (Akers).) Given the absence of state authority, each looked to the federal circuits' analysis of the issue under Title VII for guidance. We begin our analysis there as well.
The federal circuits have split into at least three camps. Two circuits, the Fifth and Eighth, take the most restrictive view: only "ultimate employment decisions," such as firing, demotion, or a reduction in pay, are adverse actions sufficient to support a retaliation claim. (Ledergerber v. Stangler (8th Cir.1997) 122 F.3d 1142, 1144; Mattern v. Eastman Kodak Co. (5th Cir.1997) 104 F.3d 702, 707.) Thomas and Akers each rejected this approach, and we agree. "The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints, and the use of intermediate retaliatory actions may certainly have this effect." (Akers, supra, 95 Cal.App.4th at p. 1455, 116 Cal. Rptr.2d 602.) An employer seeking to chill its workers from asserting antidiscrimination rights or supporting those who do has at its disposal a host of ways to inflict adversity. The FEHA's goals are compromised as much when an employer accomplishes a death by a thousand paper cuts as when it achieves its ends with a single blow.
The remaining circuits extend the prohibition on adverse action to intermediate actions. They conclude that Title VII's protection against retaliatory discrimination can extend to a wide range of adverse actions that fall short of ultimate employment decisions. (See, e.g., Wyatt v. City of Boston (1st Cir.1994) 35 F.3d 13, 15-16 [actions other than discharge are covered by Title VII's antiretaliation provision, including disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees]; Johnson v. Palma (2d Cir. 1991) 931 F.2d 203, 208-210 [prohibiting use of grievance mechanism violates antiretaliation law]; Mondzelewski v. Pathmark Stores, Inc. (3d Cir.1998) 162 F.3d 778, 787-789 [holding under parallel antiretaliation provision that small change in working hours may violate law]; Von Gunten v. Maryland (4th Cir.2001) 243 F.3d 858, 865-866, fn. 4 [rejecting ultimate employment decision test]; Morris v. Oldham, County Fiscal Court (6th Cir. 2000) 201 F.3d 784, 791-793 [supervisor harassment not involving tangible employment action may state claim]; Collins v. State of III. (7th Cir.1987) 830 F.2d 692, 702-704 [lots of phone and office accompanied by loss of status, clouding of job responsibilities, and diminution in authority demonstrate adverse job action]; Knox v. State of Ind. (7th Cir.1996) 93 F.3d 1327, 1334-1335 (Knox) [coworker harassment and vicious gossip sufficient to support retaliation verdict]; Brooks v. City of San Mateo (9th Cir.2000) 229 F.3d 917, 929 (Brooks) [range of actions short of ultimate employment decisions may support retaliation claim]; Berry v. Stevinson Chevrolet (10th Cir.1996) 74 F.3d 980, 986 [instigation of false criminal charges can support Title VII retaliation claim]; Wideman v. Wal-Mart Stores, Inc. (11th Cir.1998) 141 F.3d 1453, 1455-1456 [written reprimands, solicitation of negative comments by coworkers, and one-day suspension constitute adverse actions]; Passer v. American Chemical Soc. (D.C.Cir. 1991) 935 F.2d 322, 330-331 [canceling of public event honoring employee constitutes adverse action].)
Within this general consensus, a second split appears. Some circuits in the majority require that the adverse action materially *594 affect the terms and conditions of employment. (E.g., Torres v. Pisano (2d Cir.1997) 116 F.3d 625, 640; Hollins v. Atlantic Co., Inc. (6th Cir.1999) 188 F.3d 652, 662; Ribando v. United Airlines, Inc. (7th Cir.1999) 200 F.3d 507, 510-511; Brown v. Brody (D.C.Cir.1999) 199 F.3d 446, 457.) Others have explicitly or implicitly rejected this requirement and found actions retaliatory and prohibited even when those actions do not materially affect the terms and conditions of employment. (E.g., Ray v. Henderson (9th Cir.2000) 217 F.3d 1234, 1242 (Ray) [expressly rejecting materiality requirement]; Jeffries v. State of Kan. (10th Cir.1998) 147 F.3d 1220,1232 [expressly rejecting materiality requirement]; Wideman v. Wal-Mart Stores, Inc., supra, 141 F.3d at p. 1456 [adopting case-by-case approach without setting minimum threshold]; Passer v. American Chemical Soc., supra, 935 F.2d at p. 331 [cancellation of symposium honoring retiring employee actionable].)
In lieu of a materiality test, the EEOC and Ninth Circuit have articulated a deterrence test. Under the deterrence test, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." (Ray, supra, 217 F.3d at p. 1243.) This definition has its roots in the EEOC's Compliance Manual. "The EEOC has interpreted `adverse employment action' to mean `any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' EEOC Compliance Manual Section 8, `Retaliation,' ¶ 8008 (1998). Although EEOC Guidelines are not binding on the courts, they `constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' Meritor Savings Bank v. Vinson [ (1986) 477 U.S. 57, 65, [106 S.Ct. 2399, 91 L.Ed.2d 49]]." (Ray, supra, 217 F.3d at pp. 1242-1243.) The Ray court found the EEOC test consistent with the Ninth Circuit's prior holdings as well as those of the First, Seventh, and Tenth Circuits. (Id. at 1243.)
Thomas, supra, 77 Cal.App.4th 507, 91 Cal.Rptr.2d 770, was the first California case to address the definition of adverse action under the FEHA. In Thomas, an African-American corrections officer alleged retaliation consisting of refusal to allow medical treatment for medical conditions occurring at work, intimidation of employees whose deposition she sought in connection with her judicial proceeding, a series of undeserved negative job evaluations which resulted in a punitive job change and negative reports in her personnel file, and failure of her employer to deliver her paycheck on a timely basis for her shift differential and for overtime. (Id. at pp. 509-510, 91 Cal.Rptr.2d 770.) After canvassing the then-available federal authority, the Thomas court adopted the requirement that an adverse action be materially adverse. (Id. at pp. 510-511, 91 Cal.Rptr.2d 770.) It analyzed the employee's complaints "to determine if they result[ed] in a material change in the terms of her employment, impair[ed] her employment in some cognizable manner, or show[ed] some other employment injury." (Id. at p. 511, 91 Cal.Rptr.2d 770.)
A second Fourth District case, Akers, supra, 95 Cal.App.4th 1441, 116 Cal. Rptr.2d 602, essentially followed Thomas. Akers involved a retaliation claim by a deputy district attorney whose lawyer submitted a letter to her supervisor on her behalf, charging that she had been transferred from the domestic violence unit for sex-based, pregnancy-based, and political reasons. (Id. at p. 1447, 116 Cal.Rptr.2d 602.) After receiving the letter, her employer allegedly conducted a slanted investigation *595 and, when she contested its conclusions, threatened that she would never return to the domestic violence unit and gave her a negative performance evaluation. (Id. at pp. 1448-1449, 116 Cal. Rptr.2d 602.) Five months later, she expressed interest in a transfer to the elder abuse unit, but did not receive the transfer. (Id. at p. 1451, 116 Cal.Rptr.2d 602.) Three months thereafter, Akers took a leave of absence, and she eventually resigned without returning. She then filed suit. (Ibid.) A jury awarded Akers $250,000, which was later reduced to $150,000. (Id, at pp. 1452-1453, 116 Cal. Rptr.2d 602.)
Akers aptly considered "the `countervailing concerns' in defining an adverse employment action: `On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a [discrimination] complaint . . ., making such a complaint tantamount to a "get out of jail free" card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions.' ([Brooks, supra,] 229 F.3d [at p.] 928.)." (Akers, supra, 95 Cal.App.4th at p. 1455, 116 Cal. Rptr.2d 602.) In an attempt to balance these concerns, Akers defined an adverse action thusly: "[A]n action constitutes actionable retaliation only if it had a substantial and material adverse effect on the terms and conditions of the plaintiffs employment." (Ibid.)
Applying its test to the facts presented, the Akers court concluded that "a mere oral or written criticism of an employee or a transfer into a comparable position does not meet the definition of an adverse employment action under FEHA." (Akers, supra, 95 Cal.App.4th at p. 1457, 116 Cal. Rptr.2d 602.) It dismissed Brooks, a Ninth Circuit case which followed Ray, supra, 217 F.3d 1234 and applied Ray's test, in a one-sentence footnote: "To the extent the Ninth Circuit Court of Appeals has reached an opposite conclusion under Title VII (Brooks v. City of San Mateo, supra, 229 F.3d at p. 928), we find this view unpersuasive." (Akers, at p. 1457, fn. 4, 116 Cal.Rptr.2d 602.) Akers nevertheless affirmed the trial court judgment, presumably on the basis that the employer's threats and refusal to grant a transfer to the elder abuse unit showed a material change in Akers's employment. (Id. at p. 1457, 116 Cal.Rptr.2d 602.)
Thomas was decided before Ray and did not have the benefit of the Ninth Circuit's analysis. Akers was decided after Ray but did not cite or discuss the EEOC's (Equal Employment Opportunity Commission) definition or explain its disagreement with Brooks. For these reasons, we do not find them dispositive in deciding whether to apply the materiality test or the deterrence test. We find potential problems with the application of a materiality test. For one, no clear benchmarks exist for measuring what is "substantial" or "material." For another, this limitation establishes an arbitrary threshold untethered to what Akers recognizes as the core concern underlying the FEHA and Title VII antiretaliation provisions: the need to prevent employers from chilling protected activity. (See Akers, supra, 95 Cal.App.4th at p. 1455,116 Cal.Rptr.2d 602.)
In contrast, the deterrence test creates a standard directly tied to the purpose behind the FEHA's and Title VII's antiretaliation provisions: that which is reasonably likely to chill protected activity is prohibited. It also allows consideration of a range of retaliatory actions rather than focusing a jury solely on the "terms and conditions" of employment. The quality of one's work experience can be powerfully influenced by the quality of one's *596 relations with supervisors, peers, and subordinates. A supervisor who increases scrutiny and criticism, or ignores the harassment of an employee by coworkers, or undermines relations with an employee's subordinates may be effectively retaliating. (E.g., Dortz v. City of New York (S.D.N.Y.1995) 904 F.Supp. 127, 156 [criticism from above and undermining relations with subordinates]; Birschtein, supra, 92 Cal.App.4th at p. 1006, 112 Cal. Rptr.2d 347 [ignoring harassment from peers].) These methods may succeed in deterring future opposition even without altering the express terms or parameters of one's job description. "The law deliberately does not take a `laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." (Knox, supra, 93 F.3d at p. 1334.)
There is also a sound statutory basis for preferring the deterrence test. The FEHA, like Title VII, proscribes retaliation more broadly than discrimination. The general prohibition against discrimination extends only to discrimination "against the person in compensation or in terms, conditions, or privileges of employment." (Gov.Code, § 12940, subd. (a).) In contrast, the prohibition against retaliation states simply that an employer may not "discriminate" against an employee who opposes discrimination. (Gov.Code, § 12940, subd. (h).) The FEHA does not limit its prohibition against retaliation to discrimination in the terms and conditions of employment. Consequently, we see no reason to define prohibited retaliatory actions according to whether they materially affect the terms and conditions of employment.
Finally, the deterrence test preserves a threshold on the kind of adverse action sufficient to support a retaliation claim. Both Akers and Thomas expressed concern that the FEHA was never intended to remedy "any possible slight resulting from the filing of a discrimination complaint." (Akers, supra, 95 Cal.App.4th at p. 1455, 116 Cal.Rptr.2d 602; see Thomas, supra, 77 Cal.App.4th at p. 511, 91 Cal.Rptr.2d 770.) We agree. Adverse actions that cause displeasure or dissatisfaction, but would be insufficient to deter employees from engaging in protected activity, are not actionable. (Ray, supra, 217 F.3d at p. 1243.) Under Ray, "only non-trivial employment actions that would deter reasonable employees from complaining about [discrimination] will constitute actionable retaliation." (Brooks, supra, 229 F.3d at p. 928.) The deterrence test does not give license to litigate every minor grievance.
The deterrence test is not necessarily an easier or more difficult test to satisfy than other tests. It refocuses the inquiry on the concerns underlying antiretaliation laws, whereas "the severity of an action's ultimate impact (such as loss of pay or status) `goes to the issue of damages, not liability.'" (Ray, supra, 217 F.3d at 1243.) "[T]he EEOC test focuses on the deterrent effects" of an employer's acts. (Ibid.) This focus "effectuates the letter and the purpose" of antiretaliation statutes. (Ibid.)
For these reasons, we believe the deterrence test offers the better approach for analyzing adverse actions. We hold that under the FEHA, an adverse action is one that is reasonably likely to deter employees from engaging in protected activity.

4. Application of the Deterrence Test to Yanowitz's Allegations
Having determined the proper test for evaluating adverse actions and the scope of conduct at issue, we now apply the deterrence test to Yanowitz's evidence. Under the deterrence test, we conclude *597 that Yanowitz's showing was sufficient to survive summary adjudication.
We evaluate L'Oreal's actions objectively. The "inquiry as to whether an employment action is adverse requires a case-by-case determination based upon objective evidence. [Citation.]" (Thomas, supra, 77 Cal.App.4th at pp. 510-511, 91 Cal.Rptr.2d 770; see Vasquez v. County of Los Angeles (9th Cir.2002) 307 F.3d 884, 891 (Vasquez) ["the proper inquiry is to view the action objectively [and] to determine whether a reasonable person in the same situation would view the action as disadvantageous"].)
Vasquez adopted an objective test for evaluating adverse actions in the discrimination context. (Vasquez, supra, 307 F.3d at p. 891.) Oddly, Vasquez appeared to read Ray as supporting a partially subjective test in the retaliation context. (Vasquez, at p. 896.) We do not read Ray's test as subjective; Ray held that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." (Ray, supra, 217 F.3d at p. 1243.) This reasonable likelihood inquiry is an objective one. Similarly, nothing in the EEOC Compliance Manual, from which the deterrence test is drawn, suggests that the test is a subjective one. (See EEOC Compliance Manual, § 8, "Retaliation," at p. 8-14 [analyzing examples of potential retaliation under objective standard].) To be clear, the deterrence test we apply asks objectively whether a reasonable employee would be deterred from engaging in protected activity by the employer's conduct.
Viewing the record in the light most favorable to Yanowitz (Hersant, supra, 57 Cal.App.4th at p. 1001, 67 Cal.Rptr.2d 483), her evidence shows that she had performed well at L'Oreal. In the spring of 1998, Roderick and Wiswall began seeking out negative information about her, both from her subordinates and from her written reports. They used this information to criticize her in person and in front of peers, to prepare written memos severely criticizing her performance, to restrict her latitude in deciding how to oversee her territory, and to demand that she improve immediately, or else. They refused to review her response to their charges.
For purposes of evaluating whether this evidence carries Yanowitz's initial burden of showing an adverse action as part of her prima facie case, we credit for the moment Yanowitz's contention that the foregoing actions were unjustified. Would these actions deter a reasonable employee from engaging in protected activity? We conclude that they would. Months of unwarranted criticism of a previously honored employee, an implied threat of termination, contacts with subordinates that could have the effect of undermining a manager's effectiveness, and new regulation of the manner in which a manager oversaw her territory would discourage a reasonable manager from disobeying future unlawful orders. As in Akers, this was more than mere criticism. Taking into account the totality of the circumstances, a jury could find that the handwriting was on the wall and Yanowitz's chances of career advancement were finished as a consequence of her refusal to carry out her supervisor's order.
We do not hold that the alleged conduct occurred, or that it was unjustified by bona fide concerns that might yet be proven at trial. We hold only that, at the summary adjudication stage, Yanowitz's evidence was sufficient to make out the adverse action element of her prima facie case. "[W]hether a properly instructed jury would conclude plaintiffs evidence was sufficient as a matter of fact . . . remains an open question." (Birschtein, supra, 92 *598 Cal.App.4th at p. 1006, 112 Cal.Rptr.2d 347.)

C. Causal Nexus Between Adverse Action and Protected Activity
For the first time on appeal, L'Oreal challenges Yanowitz's showing of a causal connection between her refusal to fire a subordinate and her treatment from April to July 1998. Before the trial court, L'Oreal challenged only the other two prongs of Yanowitz's prima facie case, her showing of protected activity and adverse action.
We may not affirm the trial court's ruling on this basis. An appellate court ordinarily must sustain a summary judgment if the trial court's opinion is right upon any applicable theory of law. (Folberg v. Clara G.R. Kinney Co. (1980) 104 Cal.App.3d 136, 140, 163 Cal.Rptr. 426.) However, "the basis for a summary judgment is the absence of triable fact issues [citation], and if a point is not argued below by the moving party and the record does not establish that the opposing party could not have shown a triable fact issue had the point been raised, the appellate court cannot determine whether the trial court's decision was `right' upon that point. [Citation.]" (Ibid.) L'Oreal's moving papers did not put into dispute the issue of causation, "and we cannot conclude from the record that [Yanowitz] could not have shown a triable fact issue as to" this question. (Id. at p. 141, 163 Cal. Rptr. 426.) Yanowitz "had no reason to present . . . evidence [on this question]. 'A party opposing a motion for summary judgment cannot be required to marshal facts in opposition to the motion [that] refute claims wholly unrelated to the issues raised by the moving papers.' [Citation.]" (Ibid.) Accordingly, we cannot speculate what evidence Yanowitz might have on this point, and we will not consider whether the evidence submitted in opposition would have been sufficient to prove a causal nexus between the alleged protected activity and adverse action.

D. Pretext
In its moving papers, L'Oreal argued truth as its justification for its actions: specifically, that Yanowitz's performance was declining, that she had made mistakes, and that all criticism of her was warranted. This justification was sufficient to carry L'Oreal's burden, and to shift the burden to Yanowitz to show that the proffered justification was pretextual.
We consider whether Yanowitz has produced "substantial responsive evidence" that L'Oreal's criticisms were motivated by a retaliatory animus. (Horn, supra, 72 Cal.App.4th at pp. 806-807, 85 Cal.Rptr.2d 459; Hersant, supra, 57 Cal. App.4th at pp. 1004-1005, 67 Cal.Rptr.2d 483; West v. Bechtel Corp. (2002) 96 Cal. App.4th 966, 978, 117 Cal.Rptr.2d 647.) This showing may be made through direct evidence or circumstantial evidence. (Colarossi v. Coty USA Inc. (2002) 97 Cal. App.4th 1142, 1153, 119 Cal.Rptr.2d 131; Morgan v. Regents of University of California (2000) 88 Cal.App.4th 52, 68-69, 105 Cal.Rptr.2d 652 (Morgan).) Even a "`very little'" amount of direct evidence will suffice to defeat a summary judgment motion. (Morgan, at p. 69, 105 Cal. Rptr.2d 652.) In the alternative, pretext "may also be inferred from the timing of the company's [adverse action], by the identity of the person making the decision, and by the . . . employee's job performance before [the adverse action]." (Flait, supra, 3 Cal.App.4th at p. 479, 4 Cal.Rptr.2d 522.)
Yanowitz points to one piece of direct evidence. According to DeGracia, DeGracia spoke with Victoria Garrett, a *599 L'Oreal executive at the New York office, in March 1998. Garrett told DeGracia that Wiswall had "issues" with Yanowitz and wanted to "get rid of her. L'Oreal objected in writing to this evidence on hearsay grounds. The trial court did not rule on the objection. On appeal, L'Oreal again argues that this statement is inadmissible hearsay.
"[W]hen a trial judge fails to rule on summary judgment or adjudication evidentiary objections, they are deemed waived." (City of Long Beach v. Farmers & Merchants Bank (2000) 81 Cal.App.4th 780, 784, 97 Cal.Rptr.2d 140 (Long Beach); see also Sharon P. v. Arman, Ltd. (1999) 21 Cal.4th 1181, 1186, fn. 1, 91 Cal.Rptr.2d 35, 989 P.2d 121; Arnold v. Dow Chemical Co. (2001) 91 Cal.App.4th 698, 706, fn. 3, 110 Cal.Rptr.2d 722.) The court in Long Beach carved out one exception to this general rule that if a party objects to evidence but fails to obtain a ruling, any objection is deemed waived, and for purposes of appeal, the objectionable evidence must be considered. (Long Beach, at pp. 783-784, 97 Cal.Rptr.2d 140.) Although the defense counsel in Long Beach failed to secure an evidentiary ruling, during the summary judgment hearing, "defense counsel twice orally requested that the trial court rule on the written evidentiary objections." (Id. at p. 784, 97 Cal.Rptr.2d 140.) The court noted, "Part of the judicial function in assessing the merits of a summary judgment or adjudication motion involves a determination as to what evidence is admissible and that which is not." (Ibid.) In other words, it was the trial court's obligation, and not defense counsel's obligation, to ensure that rulings on evidentiary objections were made. The court concluded that defense counsel's written evidentiary objections were preserved for appellate review because "[f]rankly, in this case, there was nothing further defense counsel could be expected to do in terms of seeking rulings on the previously filed evidentiary objections. . . ." (Id. at pp. 784-785. 97 Cal. Rptr.2d 140.)
That exception does not apply here. Defense counsel submitted a mass of written evidentiary objections before the summary adjudication hearing. However, at the hearing, he failed to raise any of these objections or request rulings. Consequently, L'Oreal's objections were not preserved, and we may not consider them. (Code Civ. Proc., § 437c, subds. (b) & (c); Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 670, fn. 1, 25 Cal. Rptr.2d 137, 863 P.2d 207 ["Although many of the objections appear meritorious, for purposes of this appeal we must view the objectionable evidence as having been admitted in evidence and therefore as part of the record"].)
We therefore accept as true the assertion that, by March 1998, Wiswall wanted to fire Yanowitz over unspecified issues. The timing of this statement is significant. Yanowitz's evidence shows that Wiswall's repeated requests to fire the female employee he found unattractive came in the months preceding this statement. Yanowitz was only a year removed from winning Regional Sales Manager of the Year. In contrast, no performance-related concerns warranting dismissal had surfaced. L'Oreal points to some 1997 concerns from Roderick that Yanowitz was opinionated, talkative, and a poor listener. Even so, Roderick still believed "Elysa does a terrific job as a regional [sales] manager. . . ." At most, these concerns raise an issue of fact concerning the quality of Yanowitz's performance and the legitimacy of L'Oreal's later criticisms.
The circumstantial factors identified by Flait, supra, 3 Cal.App.4th 467, 478, 4 Cal.Rptr.2d 522, support a conclusion *600 of pretext as well. L'Oreal's actions toward Yanowitz followed on the heels of Yanowitz's failure to carry out Wiswall's order. The source of the adverse actions was Wiswall himself and his immediate subordinate, Roderick. Prior to the spring of 1998, Yanowitz's performance had been consistently strong over the course of nearly two decades.
Yanowitz has submitted evidence that Roderick and Wiswall actively sought negative input and subjected her performance to heightened scrutiny. (See Colarossi v. Coty U.S. Inc., supra, 97 Cal.App.4th at p. 1154, 119 Cal.Rptr.2d 131 [sudden heightened scrutiny of employee's record-keeping suggested retaliatory motive].) Yanowitz submitted evidence that many of the charges in the Roderick July 16 memorandum were untrue. (See Soda, supra, 56 Cal.App.4th at p. 156, 65 Cal.Rptr.2d 112 [denial of claimed employee errors created triable issue of pretext].) L'Oreal's refusal to review Yanowitz's written response at the July 22, 1998, meeting supports her contention that L'Oreal was interested in creating a paper trail to fire her, not working out differences over her performance. Finally, Yanowitz submitted evidence that her successor was not subjected to the same travel schedule imposed on her at the July 22 meeting.
From this evidence, Yanowitz has raised a triable issue of fact over whether Roderick's and Wiswall's concerns and criticisms were bona fide, or were part of a charade designed to create grounds for termination. A reasonable jury could conclude, based on the evidence, that it was implausible Yanowitz would have lost effectiveness so quickly, that criticism of Yanowitz over matters such as her "dictatorial" style would never have been leveled at a man in a similar situation, and that the pattern of criticisms was pretextual and designed to create grounds for achieving Wiswall's desired dismissal. We offer no views on the merits; we note only that Yanowitz's evidence, granting her the benefit of all reasonable inferences, creates a triable issue of fact over L'Oreal's motives for its actions toward her.[7]

III. Negligent Infliction of Emotional Distress

The trial court granted summary adjudication on Yanowitz's emotional distress claim, concluding that it was barred by workers' compensation exclusivity. We disagree, but affirm on an alternate ground raised by L'Oreal.
Workers' compensation exclusivity rests on the notion that, as the quid pro quo for swift and certain payment on a no-fault basis, workers cede the possibly greater recovery that might arise from a range of fault-based tort claims. (Fermino v. Fedco, Inc. (1994) 7 Cal.4th 701, 709-710, 30 Cal.Rptr.2d 18, 872 P.2d 559; see Lab.Code, § 3600.) However, exclusivity only extends to conduct which is part of the normal risks of the employment relationship. (Fretland v. County of Humboldt (1999) 69 Cal.App.4th 1478, 1492, 82 Cal.Rptr.2d 359; see Livitsanos v. Superior Court (1992) 2 Cal.4th 744, 756, 7 Cal. Rptr.2d 808, 828 P.2d 1195.) Unlawful *601 discrimination is not one of those risks, and so workers' compensation exclusivity does not bar emotional distress claims founded on discrimination. (Fretland, supra, 69 Cal.App.4th at p. 1492, 82 Cal. Rptr.2d 359.) We see no reason to distinguish between an FEHA discrimination claim and an FEHA retaliation claim; in each case, the conduct involved is not part of the normal risks attendant to the employment relationship. Thus, because Yanowitz's FEHA retaliation claim survives summary adjudication, workers' compensation exclusivity does not bar her derivative emotional distress claim based on that retaliation.
However, we may affirm on any basis supported in the trial court record. Yanowitz's emotional distress claim fails on the merits. The cause of action for negligent infliction of emotional distress is simply a subspecies of negligence and requires proof of the same elements as any negligence claim. (Burgess v. Superior Court (1992) 2 Cal.4th 1064, 1072, 9 Cal.Rptr.2d 615, 831 P.2d 1197; Semore v. Pool (1990) 217 Cal.App.3d 1087, 1105, 266 Cal.Rptr. 280.) As L'Oreal correctly argues, "`An employer's supervisory conduct is inherently "intentional."'" (Semore v. Pool, supra, at p. 1105, 266 Cal.Rptr. 280, quoting Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 160, 233 Cal. Rptr. 308, 729 P.2d 743.) Such conduct will not support a claim for negligent infliction of emotional distress. (Semore v. Pool, supra, at p. 1005, 266 Cal.Rptr. 280.) Put another way, an employee cannot avoid the stringent requirements of an intentional infliction of emotional distress claim, including proof of "outrageous conduct" that "`exceed[s] all bounds usually tolerated by a decent society'" (Cole v. Fair Oaks Fire Protection Dist, supra, at p. 155, fn. 7, 233 Cal.Rptr. 308, 729 P.2d 743), by contending that the employer's intentional supervisory acts directed at the employee were negligent. Both before the trial court and on appeal, Yanowitz has recited only intentional acts by L'Oreal. We affirm the trial court's summary adjudication of this claim.

IV.-V.[**]

DISPOSITION
The judgment is reversed on Yanowitz's FEHA claim for retaliation, and this case is remanded for further proceedings on that claim. In all other respects, the judgment is affirmed. Yanowitz shall recover her costs on appeal.
We concur: STEVENS, Acting P.J, and SIMONS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV and V.
[1] L'Oreal USA, Inc. was formerly known as Cosmair, Inc. For simplicity, we refer to defendant as "L'Oreal" throughout.
[2] Originally, Yanowitz prevailed on a single theory underlying her UCL claim. However, she dismissed that portion of her suit with prejudice so that a final, appealable judgment could be entered.
[3] See, e.g., Note, Facial Discrimination: Extending Handicap Law to Employment Discrimination on the Basis of Physical Appearance (1987) 100 Harv. L.Rev.2035.
[4] The FEHA does proscribe weight discrimination in those circumstances where excess weight can be shown to constitute a disability or handicap. (Cassista v. Community Foods, Inc. (1993) 5 Cal.4th 1050, 1065, 22 Cal. Rptr.2d 287, 856 P.2d 1143.) That proscription is not at issue in this case.
[5] Given the similarity between Title VII and the FEHA, California courts often rely on federal authority in the area of employment discrimination law. (See Reno v. Baird (1998) 18 Cal.4th 640, 647, 76 Cal.Rptr.2d 499, 957 P.2d 1333.)
[6] L'Oreal relies on National R.R. Passenger Corp. v. Morgan (2002) 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106, the United States Supreme Court's most recent pronouncement on the continuing violation doctrine under Title VII. This is an FEHA case, and the California Supreme Court set out the continuing violation doctrine under the FEHA just last year in Richards, supra, 26 Cal.4th 798, 111 Cal.Rptr.2d 87, 29 P.3d 175. The rule that we will look to federal precedent under Title VII for guidance on FEHA questions only applies in the absence of controlling state authority. Because Richards governs this case, we need not decide what result might obtain under National R.R. Passenger Corp. v. Morgan.
[7] On September 3, 2002, Yanowitz filed a request for judicial notice. We deferred ruling on the request so that we could consider it along with the merits of the appeal. Having now considered Yanowitz's request, we deny it. Yanowitz has asked this court to take judicial notice of a Title VII complaint filed by an unrelated party against Polo Ralph Lauren Corporation in federal court in New York. We decline to take judicial notice of the complaint and its exhibits because they have no bearing on the issues before us. (See Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063, 31 Cal.Rptr.2d 358, 875 P.2d 73.)
[**] See footnote *, ante.