Mustafa ALAM, Lili–Ann Ackerman, David Alan DuBois, Cesar Nazaire, Robert Scott Newman, William L. Oulette, Peter Jonathan Parish, Robert Sean Saunders, Mohammad Rahim Vafa, Robert Dunlap Vail, Jacquelynn I. Wheeling, Plaintiffs,

v.

RENO HILTON CORPORATION, a Nevada corporation, d/b/a Flamingo Hilton Reno, and Pacos Hilton Hotels Corporation, a foreign corporation; Michael Giorgilas, George Andrews, and Does 1 through 30, Defendants.

No. CV–N–91–101–ECR.

United States District Court,
D. Nevada.

Feb. 19, 1993.

908

Law Offices of Calvin R.X. Dunlap, and Hager & Mausert, Reno, NV, for plaintiffs.

Dan C. Bowen, Lionel Sawyer & Collins, Reno, NV, Pat Lundvall, Morris Brignone & Pickering, Las Vegas, NV, for defendants.

**ORDER**

EDWARD C. REED, Jr., District Judge.

This case involves an employment discrimination action. The plaintiffs were all employees of defendant Reno Hilton Corporation during the time of the alleged discriminatory practices.[1] Defendants Michael Giorgilas and George Andrews were management employees employed by the Reno Hilton.[2] Reno Hilton and Hilton are separate and distinct legal entities. The Reno Hilton in its individual capacity was the plaintiffs' employer. Hilton, the parent corporation, was not plaintiffs employer and therefore not liable to plaintiffs.[3] During the period at issue Reno Hilton operated two gaming establishments in downtown Reno, one known as the Flamingo Hilton and the other known as Paco's.

1. Several of the plaintiff employees are still employed with the Reno Hilton.

2. Mr. Giorgilas was the casino manager and later president for Reno Hilton. Mr. Andrews was the casino manager for Paco's.

3. Plaintiffs did not argue to the contrary to this issue in their opposition papers, thereby conceding this point.

4. Allegations of other types of discrimination (i.e. discrimination based on age and religion) beyond that pleaded in their complaint will not be considered. Plaintiffs motion to amend the complaint to include age discrimination as to plaintiff Wheeler (document # 50) was DENIED by this

All plaintiffs in this action seek reinstatement and damages, both compensatory and punitive, for what they allege was race and sex discrimination.[4] The first amended complaint asserts eight claims for relief. The first two are federal claims alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Appended to these federal claims are state law claims for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, negligence, tortious interference with contractual relations, and retaliation.

The plaintiffs are best considered in two separate categories due to the distinct fact patterns surrounding their allegations. A single plaintiff, Mohammad Rahim Vafa employed solely at the Flamingo Hilton establishment, alleges that he was assigned to work night shifts and then was not called to work for approximately one month because he is male and of Iranian descent. The remaining ten plaintiffs: Alam, Ackerman, Dubois, Nazaire, Newman, Oulette, Parrish, Saunders, Vail and Wheeling were all working as dealers at the Paco's location and sought transfer to the Flamingo location ("Paco's Plaintiffs"). They allege that they were not transferred to the preferred location[5] due to a surreptitious policy of employing only young "barbie doll" type women (i.e. sexually attractive) and that such a policy discriminated against men and persons of minority backgrounds.

Defendants filed two summary judgment motions one against Plaintiff Vafa (document # 32) and one against the Paco's Plaintiffs (document # 33). Plaintiffs filed one opposi-

Court and no other types of discrimination were properly pled.

5. The Flamingo Hilton was considered the better location for dealers because more money was made in tips at this location as compared to Paco's. In 1990 all of the live gambling games were phased out of Paco's causing the dealers at this location to seek other employment. Initially transfers from Paco's were not to be considered for the Flamingo openings; however, due to the number of unfilled dealer positions available, defendants modified this policy to allow dealers from Paco's to apply to the Flamingo.

tion to the two motions (document #47)[6] and defendants replied (documents #51 and #56). The Court will now consider the two summary judgment motions together.

■ The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed. R.Civ.P. 56(c); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141 (9th Cir.1983).

■ The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson, supra.* As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered.

*Id.* at 248, 106 S.Ct. at 2510. Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex, supra.*

Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.* When faced with a motion for summary judgment, the material before the court "must be viewed in the light most favorable to the [non-moving] party." *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In the matter at hand, the Court will consider the pendent state claims first. With regard to the breach of contract claim the Court finds that there was no contract to breach. All the plaintiffs were at-will employees of Reno Hilton. It is unclear upon what basis plaintiffs allege a contractual relationship with the Hilton beyond the at-will employee relationship. The employee handbook, an implied contract and, with regard to the Paco's plaintiffs, a contract arising from the transfer policy are the only possibilities on which plaintiffs could base their contractual claims.

■ Employee handbooks and standardized procedures are not generally considered contracts of employment. *Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989). However, under some circumstances provisions in handbooks may give rise to an inference of an employment contract. *D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206 (1991). While the law in Nevada recognizes the potential for an inferred contract, it is also recognized that an employer has the ability to include an express disclaimer that will prevent a handbook from being construed as a contract of employment. *D'Angelo* 819 P.2d at 209 n. 4. None of the attending circumstances in the case at hand supports the inference that the handbook formed part of an employment contract between the parties; moreover, the handbooks distributed to the Reno Hilton employees

---

**6.** The Court considered the 77 page opposition in this matter; however, it should be made clear that in the future it would behoove plaintiffs to follow the Local Rules of Practice, specifically Rule 140–2 regarding the procedure and format for filing such documents over 30 pages.

contained explicit disclaimers to this effect. No contract of employment was created through the handbook.

 Plaintiff also makes vague references to an implied employment contract and the public policy of Nevada against discriminatory practices (opposition document # 47 p. 42). While it is against the law to terminate an employee for reasons contrary to public policy, this tort is not dependent upon or directly related to a contract of continued employment. *D'Angelo, supra.* Moreover, the public policy tortious discharge is limited and has been interpreted to protect against specific actions contrary to public policy such as the discharge of an employee for seeking industrial insurance benefits, for performing jury duty, for refusing to work under unreasonably dangerous conditions, or for refusing to violate the law. *See e.g.* NRS 6.190; *Hansen v. Harrah's,* 100 Nev. 60, 675 P.2d 394 (1984). There is no public policy against choosing "barbie doll" type employees over others.

 In addition, there is no evidence of implied contracts of employment in this case. There is no evidence of verbal promises from management or any other representation that could be construed as a promise of continued employment. No evidence has been submitted demonstrating that a relationship of trust, reliance or dependency of continued employment developed between the employer and the employees in this case. Contracts of employment will not be created by an employee's subjective expectations. *Vancheri, supra* 777 P.2d at 369.

 Finally, the Paco's plaintiffs claim that the Reno Hilton's February 2, 1990 written transfer policy also constitutes a contract of employment is without merit. The Reno Hilton created a written transfer policy when reorganizing Paco's and hiring additional persons for the Flamingo. However, the transfer policy, like the employee handbooks, included a disclaimer stating that nothing therein shall be construed as changing the terms of the Employee Handbook or any other employment policies of the employer. The handbook, as previously discussed, stated that neither the handbook nor any of any

other policy or procedure constitutes a contract of employment. Under *D'Angelo*, such a disclaimer effectively removes the possibility that an employment contract could arise from the transfer policy.

Theoretically, employment-at-will is a contractual relationship governed by contract law. However, an employer can dismiss at-will employees with or without cause. Plaintiffs have failed to offer any evidence indicating that an employment contract beyond an at-will relationship existed between themselves and Reno Hilton. Without evidence of such a contract, Plaintiffs claim of breach of contract fails.

 Necessarily, plaintiffs claim of tortious breach of implied covenant of good faith and fair dealing also fails absent a contractual relationship. Implying a covenant of good faith and fair dealing presupposes the existence of a contract. *Sands Regent v. Valgardson,* 105 Nev. 436, 777 P.2d 898, 899 (1989). Unlike a tortious discharge (i.e. contrary to public policy—discussed above), a bad faith discharge tort is committed when an employer, acting in bad faith, discharges an employee who has established contractual rights of continued employment and who has developed a relationship of trust, reliance and dependency with the employer. A bad faith discharge cannot be committed against an at-will employee. *D'Angelo,* 819 P.2d at 212.

 Before a covenant of good faith and fair dealing can be implied not only there must be a breach of an employment contract, there must be a determination of a special relationship in which special reliance, trust and dependency is part. *K Mart Corp v. Ponsock,* 103 Nev. 39, 732 P.2d 1364, 1372 (1987). The special relationship required is one of particular reliance as found in insurance, partnership, and franchise agreements where there is a need for special protection arising from the skewed balance of power between the parties and the heavy reliance on the credibility by one party on the other. Such a special relationship will not automatically be read into an employer/employee relationship. *Compare D'Angelo, supra,* with *Ponsock, supra.* In this case, the facts do

not demonstrate the ripening of the requisite relationship. Without an employment contract or the existence of a special relationship, the claim for tortious breach of the implied covenant of good faith and fair dealing must fail as a matter of law.

■ Plaintiffs claim for intentional infliction of emotional distress is also without merit. Plaintiffs rely on the same facts to support the emotional distress claim as they do for their sex and race discrimination claim. The necessary elements of the tort of intentional infliction of emotional distress are: 1) the defendants' conduct was extreme and outrageous; 2) defendants' conduct was non-privileged; 3) defendants acted with the intention to cause plaintiffs emotional distress, or with reckless disregard for the probability for causing such distress; 4) plaintiffs actually suffered severe or extreme emotional distress; and 5) defendants' conduct actually or proximately caused the emotional distress. Nelson v. City of Las Vegas, 99 Nev. 548, 665 P.2d 1141, 1145 (1983). Plaintiffs are unable to prove all the requisite elements. First, there was no extreme and outrageous conduct on the part of defendants. Secondly, termination of employees, even in the context of a discriminatory policy, does not in itself amount to extreme and outrageous conduct actionable under an intentional infliction of emotional distress theory. There is no evidence that defendants conduct even came close to the requisite level of outrageous and extreme. Liability is only found in extreme cases where the actions of the defendant go beyond all possible bounds of decency, is atrocious and utterly intolerable. Restatement (Second) of Torts § 46 comment d (1965). Discriminatory employment practices are wrong and federal law makes such conduct unlawful and provides for relief; however, the tort of intentional infliction of emotional distress is not intended to reach every discrimination claim. See Grandchamp v. United Air Lines, Inc., 854 F.2d 381 (10th Cir.1988) cert. denied 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 838 (1989).

■ In addition none of the plaintiffs suffered legally sufficient emotional distress to sustain this claim. "Severe emotional dis-

tress" must be suffered. In other words the stress must be so severe and of such intensity that no reasonable person could be expected to endure it. Nelson supra. Moreover, the less extreme the outrage (as in this case) the more appropriate it is to require evidence of physical injury or illness from the emotional distress. The deposition testimony in this matter relates plaintiffs' feelings of inferiority, headaches, irritability and in the case of one plaintiff the loss of ten pounds. Although sympathetic to any discomfort suffered by the plaintiffs, this Court cannot find that such agitation amounts to severe emotional distress.

The questions of whether the evidence of plaintiffs' distress is sufficient (i.e. "severe") to allow the claim to advance to the trier of fact and whether defendants conduct may reasonably be regarded as so extreme and outrageous as to permit recovery are questions for the Court to answer. Restatement (Second) of Torts § 46 comment h and comment j (1965). Looking at the evidence submitted in the light most favorable to the plaintiffs, this Court finds neither the distress suffered by plaintiffs nor the conduct of the defendants sufficient to sustain the claim of intentional infliction of emotional distress.

■ The claim for tortious interference with contractual relations fails for the lack of a valid and existing contact of continuing employment and for lack of interference by an intervening party. In order to sustain a claim for intentional interference one must show 1) a valid and existing contract; 2) the defendant's knowledge of the contract; 3) intentional acts designed to disrupt the contractual relationship; 4) actual disruption of the contractual relationship; and 5) resulting damages. Sutherland v. Gross, 105 Nev. 192, 772 P.2d 1287 (1989). An at-will employee relationship is not a contract with which a third party can interfere. See Hicks v. Clyde Fed. Sav. & Loan, 696 F.Supp. 387, 389 (N.D.Ill.1988). In addition the defendants named in this claim (managers Giorgilas and Andrews) do not constitute intervening third parties as they are agents acting in the scope of their principal's (the Reno Hilton) interest. See Haigh v. Matsushita Elec. Corp. of America, 676

F.Supp. 1332, 1349 (E.D.Va.1987) citing Restatement (Second) of Torts § 766 (1987).

Finally with regard to the claim of retaliation only two plaintiffs (both from the Paco's Group) may advance such a claim. The remaining plaintiffs either testified that they were not subjected to any adverse or retaliatory conduct after they filed their charges of discrimination with the Nevada Equal Rights Commission or they never filed charges of discrimination alleging retaliatory conduct. Only plaintiffs Oulette and Newman are entitled to advance a claim for retaliation.

Pursuant to 42 U.S.C. § 2000e-3(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter. To establish a prima facie case for a claim of retaliation, a plaintiff must demonstrate: 1) statutorily protected participation in opposing Title VII discrimination which is known by the alleged retaliatory; 2) he or she was severely disadvantaged by an action of his or her employer subsequent to or contemporaneously with such opposition of participation and 3) a causal connection between the protected activity and the employment action. *Gunther v. County of Washington*, 623 F.2d 1303, 1314 (9th Cir.1979), aff'd on other grounds 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Assuming that the retaliatory conduct of which the plaintiffs complained, (the verbal abuse, increased scrutiny and disciplinary actions) is true, the defendants must have created a sufficiently abusive environment that led to the employees constructive discharge. *Jordan v. Clark*, 847 F.2d 1368, 1377 (9th Cir.1988) *cert. denied* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). A constructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in the employee's position would have felt that he was forced to quit because of intolerable and discriminatory working conditions. *Jordan* at 1377.

The evidence shows that plaintiffs Oulette and Newman were not constructively discharged or otherwise illegally discharged. Plaintiff Oulette abandoned his position at Reno Hilton. He chose to leave on an unauthorized vacation and his termination sheet lists his reason for leaving as "self termination, job abandonment." Plaintiff Newman continued in the employ of Reno Hilton until all the dealing positions at Paco's were dissolved. He did not request employment on the Flamingo side after the reorganization of Paco's, but left the employ of the casino industry altogether. Neither the complaint nor the depositions relating to this matter support the retaliation claim. Neither plaintiff was constructively discharged and their claims of retaliation must be dismissed as a matter of law.[7]

The final claims that need to be addressed are those for race and sex discrimination under Title VII. A plaintiff's proof of his or her Title VII discrimination claim proceeds in three stages. First, the plaintiff bears the burden of establishing a prima facie case of employment discrimination. If a prima facie case is shown, the defendant bears the burden of producing evidence of some legitimate, non-discriminatory reason for the employer's action. Finally, if such a reason is offered, the plaintiff must demonstrate that the defendant's articulated reason is a mere pretext for unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Plaintiff Vafa alleges that he was discriminated against because of his ethnicity (Iranian) and because of his gender via a discriminatory assignment of shifts. For plaintiff Vafa to prevail on his Title VII claim under a disparate treatment analysis he must show that 1) he is within a class protected by Title VII, 2) he requested an employment opportunity that his employer was offering and he had the requisite qualifications for

---

7. An additional claim of negligence was asserted by plaintiffs in the amended complaint; however, plaintiffs expressly conceded there was no actionable negligence claim in this action in their opposition (document # 47 p. 74).

that offering; 3) he was rejected and 4) his employer continued to seek applicants with his same qualifications for the same employment opportunity. *McDonnell Douglas Corp., supra.* Plaintiff Vafa cannot demonstrate all these elements. The evidence shows that Plaintiff was suspended without pay for refusing to work the graveyard shift to which he was assigned.[8] Once it was confirmed that Mr. Vafa's had a legitimate medical reason for not working the graveyard shift, he was assigned to work swing shift and ultimately was reassigned to a day shift where he continues to work as a floor supervisor at Reno Hilton today. The evidence also shows that many people, most of whom were not minorities were also reassigned to different shifts during the time Vafa's schedule was changed. Finally unrefuted evidence has been submitted to demonstrate the non-discriminatory reasons for placing Mr. Vafa on the graveyard shift. Namely, to give him the opportunity to develop his less than adequate computer skills during a shift with a slower pace, the seasonal shift in business, and finally the fact that twenty-four hour gaming facilities necessarily practice flexible staffing of day, swing, and graveyard shifts.

The backdrop of the allegations of discrimination on behalf of the Paco's Plaintiffs does not help Plaintiff Vafa. There is no evidence that Vafa's assignment or temporary suspension were caused by discriminatory employment practices. The Defendants position is further bolstered by the fact that they had a legitimate non-discriminatory reasons for the scheduling decisions regarding plaintiff Vafa. Plaintiff Vafa's claim fails for want of proof to the requisite elements of a title VII action.

■■■ With regard to the Paco's plaintiffs the discrimination claim must be analyzed under a disparate impact analysis. These plaintiffs claim that the transfer policy, although seemingly neutral on its face, in effect had an adverse impact on the minority plaintiffs. Specifically, plaintiffs claim that despite their superior skills, other persons were hired due to their physical appeal. Under this type of analysis, the plaintiff need not prove discriminatory intent but only that the selection system results in a "significantly discriminatory impact." *Peters v. Lieuallen,* 693 F.2d 966 (9th Cir.1982). The burden then shifts to the employer to prove that no disparity exists, or that the practice is necessary to efficient operation of the business.[9]

In the case at bar, 17 employees were ultimately transferred from Paco's to the Flamingo. Of the 17, six were male and three were non-caucasians. Plaintiffs fail to demonstrate the discriminatory impact of the transfer policy. Moreover, the defendant articulated a legitimate reason as to why plaintiffs were not transferred—to keep Paco's staffed as needed prior to the decision to phase out the live games.

The real complaint appears not to be about race or sex discrimination, but the selection of "sexually attractive" or "barbie doll" persons (as coined by the defendants), for dealer positions at the Flamingo. The fact Plaintiff Wheeling is included among the Paco's Plaintiffs supports that such is the gravamen of plaintiffs complaint. Wheeling is a caucasian female. She possesses the same traits as the alleged preferred class that was transferred except that she chooses not to identify herself as "barbie doll type." Wheeling's participation in this suit highlights the real protest, the hiring of what the defendants label "sexually attractive" persons. Even if the Reno Hilton did hire and transfer employees on the basis of their sexual attractiveness, such behavior is not actionable under Title VII. *See generally* 42 U.S.C. § 2000e et seq. *See also King v. Palmer,* 598 F.Supp. 65 (D.C. 1984) *reversed on other grounds,* 778 F.2d 878 (D.C.Cir.1985). *See also Malarkey v. Texaco,* 559 F.Supp. 117 (S.D.N.Y.1982) aff'd 704 F.2d 674 (2d Cir.1983). Staffing decisions based on such subjective qualities dem-

---

8. Vafa represented on his employment application that there was no reason he would be unable to work the graveyard shift.

9. It is somewhat unclear as to what analysis plaintiffs seek to pursue the discrimination claim. It is worthwhile to note here that under a disparate treatment analysis the plaintiffs claim could only be one of sexually attractive people being hired over other qualified employees since men, women and minorities were hired by Flamingo. There can be no such cause of action under title VII.

onstrates a rather atavistic approach on the part of the employer; however, when such criteria are applied to different classes of people, the practice is not actionable. No Court can be expected to create a standard on such vagaries as attractiveness or sexual appeal. The plaintiffs obligation in this case was to show this Court substantial evidence of a disparate impact on a protected class. They have failed to do so. Instead, they have provided argument regarding the Reno Hilton's preference to employ dealers with "barbie doll" images, a category in which they do not include themselves. These allegations are insufficient even when all other factors are viewed in the light most favorable to the plaintiffs. Plaintiffs have not provided sufficient evidence as to the discriminatory impact of the transfer policy and defendant Reno Hilton articulated legitimate reasons for its actions with regard to all the plaintiffs that were not transferred. Paco's Plaintiffs claims of discrimination fail.

IT IS, THEREFORE, HEREBY ORDERED that Defendant Hilton's Motions for Summary Judgment with regard to Plaintiff Vafa (document # 32) and the Paco's Plaintiffs (document # 33) are GRANTED. Clerk shall enter judgment accordingly.