**JPMORGAN CHASE BANK, N.A., Plaintiff,**

v.

**KB HOME et al., Defendants.**

**and All Related Actions.**

Nos. 2:08–CV–01711–PMP–RJJ, 2:08–CV–01717–PMP–RJJ, 2:08–CV–01714–PMP–RJJ, 2:08–CV–01715–PMP–RJJ, 2:08–CV–01709–PMP–RJJ, 2:08–CV–01713–PMP–RJJ, 2:08–CV–01716–PMP–RJJ.

United States District Court, D. Nevada.

July 15, 2009.

James E. Hough, Jamie A. Levitt, Morrison & Foerster LLP, New York, NY, Allyson R. Noto, Jeffrey R. Sylvester, Sylvester & Polednak, Ltd., Las Vegas, NV, for Plaintiff.

Bruce E. Van Dalsem, Erica P. Taggart, Johanna Y. Ong, Michael T. Lifrak, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Benjamin D. Lichtman, Mark T. Drooks, Bird, Marella, Boxer, Wolpert, Nessim, Drooks, et al., Los Angeles, CA, Donald A. Lattin, Maupin, Cox & Legoy, Reno, NV, Andrew J. Detherage, Karoline E. Jackson, Barnes & Thornburg LLP, Indianapolis, IN, Megan K. Dorsey, Koeller Nebeker Carlson & Haluck, LLP, Randolph L. Howard, Kolesar & Leatham, Chtd., Anthony B. Golden, Christopher H. Byrd, Craig S. Newman, Fennemore Craig, P.C., Anthony P. Sgro, Patti & Sgro, Las Vegas, NV, Mark S. Cohen, Oliver Haker, Sandra C. McCallion, Cohen & Gresser LLP, New York, NY, Donald A. Lattin, Maupin, Cox & Legoy, Patricia K. Lundvall, McDonald Carano Wilson LLP, Reno, NV, Fredric C. Nelson, John R. Foote, John R. Foote, Nixon Peabody LLP, San Francisco, CA, for Defendants.

## *ORDER*

PHILIP M. PRO, District Judge.

Presently before the Court are five Motions to Dismiss filed by the following Defendants: KB Home and KB Home Nevada Inc. (2:08–CV–01711–PMP–RJJ (Base File), Doc. # 27); Coleman–Toll Limited Partnership and Toll Brothers, Inc. (2:08–CV–01713–PMP–RJJ, Doc. # 24); Beazer Homes Holdings Corp. and Beazer Homes USA, Inc. (2:08–CV–01715–PMP–RJJ, Doc. # 35); Pardee Homes of Nevada and Weyerhaeuser Real Estate Co. (2:08–CV–01716–PMP–RJJ, Doc. # 24); and Meritage Homes of Nevada, Inc. and Meritage Homes Corp. (2:08–CV–01717–PMP–RJJ, Doc. # 28).

## I. BACKGROUND

This case involves a dispute over the financing of a 2,000–acre real estate development in Henderson, Nevada, named "Inspirada." (Compl.(Doc.# 1) ¶¶ 12, 14.)[1] As alleged in the Complaint, eight real estate companies (the "Members")[2] formed non-party South Edge, LLC ("South Edge") in May 2004 to facilitate the purchase of the land for Inspirada. (*Id.* ¶ 15.) On May 3, 2004, the Members entered into an Amended and Restated Operating Agreement of South Edge, LLC (the "Operating Agreement"). (Compl. ¶ 23, Ex. B.) Each Defendant Member also is a subsidiary of a separate Defendant parent company (the "Parents").[3] (Compl. ¶¶ 9, 11.)

On June 2, 2004, South Edge successfully bid $557 million for the land for Inspirada from the United States Bureau of Land Management ("BLM"). (Compl. ¶ 15, Ex. C at 1.) On October 29, 2004, each Member agreed to purchase or "take down" specified parcels of land in Inspirada from South Edge pursuant to Purchase and Sale Agreements and Joint Escrow Instructions between South Edge and each Member (the "Acquisition Agreements"). (Compl. ¶¶ 16, 24, Ex. C.) Each Parent co-signed their related Member's respective Acquisition Agreement. (Compl., Ex. C.)

To finance the purchase from the BLM, South Edge entered into a November 1, 2004 credit agreement between South Edge as the borrower, Plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan") and other financial institutions as lenders, and Plaintiff JPMorgan as the administrative agent. (Compl. ¶ 15.) On March 9, 2007, the credit agreement was replaced by an Amended and Restated Credit Agreement (the "Credit Agreement") between the same parties. (Compl. ¶ 15, Ex. A.) To provide security for the Credit Agreement, South Edge executed several other documents (the "Collateral Documents") in favor of Plaintiff and the other lenders. (Compl. ¶ 25.) One such Collateral Document is a Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases (the "Deed of Trust"), which secures the Credit Agreement. (Compl. ¶ 25(a), Ex. D.) Additionally, South Edge granted Plaintiff a security interest in permits, construction and labor contracts, and plans for Inspirada through an Assignment of Contracts, Permits and Plans and Specifications (the "Assignment of Contracts"). (Compl. ¶ 25(b), Ex. E at 1–2.) South Edge also granted Plaintiff a security interest in the Acquisition Agreements through an Assignment of and Agreement with Respect to Acquisition Agreements (the "Assignment of Acquisition Agreements"). (Compl. ¶ 25(c), Ex. F.) Finally, Plaintiff alleges the existence of a Uniform Commercial Code ("UCC") financing statement perfecting Plaintiff's security interest in personal property, such as the Acquisition Agreements and the

---

1. Document numbers refer to the base file, 2:08–CV–01711–PMP–RJJ, unless otherwise noted.

2. The eight Members are KB Home Nevada, Inc.; Focus South Group, LLC; Coleman–Toll Limited Partnership; Meritage Homes Nevada, Inc.; Beazer Homes Holding Corp.; Pardee Homes of Nevada; Alameda Investments, LLC; and Kimball Hill Homes Nevada, Inc. (Compl. ¶ 8.) Kimball Hill Homes Nevada, Inc. is involved in Chapter 11 bankruptcy proceedings and thus was not named as a Defendant. (*Id.* at 3 n. 1.)

3. The Parents include KB Home; John A. Ritter; Toll Brothers, Inc.; Meritage Homes Corp.; Beazer Homes USA, Inc.; Weyerhaeuser Real Estate Company; Woodside Group, Inc.; and Kimball Hill Inc. (Compl. ¶ 9.) Kimball Hill Inc. is involved in bankruptcy proceedings and therefore was not named as a Defendant in any of the related proceedings. (*Id.* at 3 n. 1.)

Operating Agreement. (Compl. ¶¶ 25(d), 26.)

The Members thereafter allegedly refused to take down land from South Edge under the Acquisition and Operating Agreements. (*Id.* ¶ 35.) South Edge also defaulted under the Credit Agreement and Collateral Documents for failure to pay and failure to complete the construction of Inspirada. (*Id.* ¶¶ 33–34.) Plaintiff requested assurances of performance and cure of defaults from Defendants but Defendants failed to comply. (Compl. ¶¶ 39–40, Exs. G, H.)

On December 5, 2008, Plaintiff filed suit in this Court, alleging causes of action for breach of contract against the Members (count 1), breach of contract against the Parents (count 2), breach of fiduciary duty against the Members and Parents (count 3), intentional interference with contractual relations against the Parents (count 4), and constructive and/or resulting trust against the Members and Parents (count 5). (Compl. at 10–12.) Five Members[4] and their related Parents[5] now move to dismiss, arguing the terms of the contracts incorporated into the Complaint require dismissal of Plaintiff's claims.

## II. LEGAL STANDARD

When ruling on a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." *Siaperas v. Mont. State Comp. Ins. Fund,* 480 F.3d 1001, 1003 (9th Cir.2007) (quotation omitted). Although a plaintiff's factual allegations need not be detailed, a plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court is not "required to accept as true conclusory allegations that are contradicted by documents referred to in the complaint, and [the Court does] not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Paulsen v. CNF Inc.,* 559 F.3d 1061, 1071 (9th Cir.2009). Dismissal is proper only if no cognizable legal theory exists or the plaintiff has alleged insufficient facts to support a cognizable legal theory. *Siaperas,* 480 F.3d at 1003.

## III. DISCUSSION

■■■ Under Nevada law,[6] when the facts are not in dispute, contract interpretation is a question of law. *Lehrer McGovern Bovis, Inc. v. Bullock Insulation, Inc.,* 197 P.3d 1032, 1041 (Nev.2008). Generally, the Court construes unambiguous contracts according to their plain language. *Sheehan & Sheehan v. Nelson Malley & Co.,* 121 Nev. 481, 117 P.3d 219, 223–24 (2005). A contract is ambiguous if it is subject to more than one reasonable interpretation. *Anvui, LLC v. G.L. Dragon, LLC,* 123 Nev. 25, 163 P.3d 405, 407 (2007). When interpreting a contract, "the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself." *Sheehan,*

---

4. KB Home Nevada, Inc.; Coleman–Toll Limited Partnership; Meritage Homes Nevada, Inc.; Beazer Homes Holding Corp.; and Pardee Homes of Nevada.

5. KB Home; Toll Brothers, Inc.; Meritage Homes Corp.; Beazer Homes USA, Inc.; and Weyerhaeuser Real Estate Company.

6. Although some of the documents attached to the Complaint state the parties agree New York law applies and other documents are conflicting as to whether New York or Nevada law applies, the parties apply Nevada law. The Court therefore will proceed under Nevada law.

117 P.3d at 224 (quotation omitted). "The parties' intentions regarding a contractual provision present a question of fact." *Anvui, LLC,* 163 P.3d at 407.

### A. Breach of Contract Against the Members (Count 1)

Defendants argue the breach of contract claim against the Members fails as to the Operating Agreement because Plaintiff lacks standing to enforce the Operating Agreement.[7] Specifically, Defendants contend Section 15.15 of the Operating Agreement bars Plaintiff from enforcing the Operating Agreement for its own benefit, the power of attorney provision in the Credit Agreement cannot be interpreted to allow Plaintiff to enforce the Operating Agreement, and no other document authenticated by South Edge describes the Operating Agreement as collateral.

Plaintiff responds that Section 15.15 applies to third-party beneficiaries, not secured creditors such as Plaintiff. Plaintiff also contends Section 15.15 is a boilerplate limitation that cannot preclude security interests Plaintiff received later in the Collateral Documents, such as the Deed of Trust. Additionally, Plaintiff argues Defendants' interpretation of Section 15.15 conflicts with the UCC.

Defendants reply that Section 15.15 is a substantive provision applying to all creditors. Defendants contend Plaintiff failed to allege or attach a document stating the Operating Agreement was assigned to Plaintiff and Plaintiff, as a sophisticated lender, never obtained a concession allowing it to enforce the Operating Agreement. Further, Defendants argue the Deed of Trust does not grant Plaintiff a security interest in the Operating Agreement because the Deed of Trust does not reference or describe the Operating Agreement, the Operating Agreement is a governance document not related to real or personal property, and, in any event, South Edge could not pledge rights in the Operating Agreement because it was not a party to that contract.

■ Section 15.15 of the Operating Agreement states that "[n]one of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, any Manager or any Member." (Compl., Ex. B at 62.) Under the plain language of this provision, no creditor can enforce the provisions of the Operating Agreement. Nonetheless, Plaintiff alleges that the Deed of Trust and other Collateral Documents granted Plaintiff a UCC-governed security interest in the Operating Agreement, and Plaintiff therefore can enforce any rights South Edge has under the Operating Agreement.[8] (Compl. ¶¶ 25–27.)

■ An Article 9 security interest attaches and therefore is enforceable against the debtor if three requirements are met: (1) value was given; (2) the debtor has rights in the collateral; and (3) either (a) the debtor has authenticated a security agreement describing the collateral, or (b) the secured party possesses the collateral pursuant to a security agreement. *In re Schwalb,* 347 B.R. 726, 741 (Bankr.D.Nev. 2006) (citing Nev.Rev.Stat. § 104.9203(a)-(c)). A description of collateral is suffi-

---

**7.** Defendants do not dispute that Plaintiff has rights in the Acquisition Agreements and, thus, only move to dismiss count one as to the Operating Agreement.

**8.** Plaintiff also argues Nevada Revised Statutes §§ 104.9406(4), 104.9408(1), and

104.9607 render Section 15.15 of the Operating Agreement ineffective. Even if this is true, Plaintiff has a security interest in the Operating Agreement only if Plaintiff has been granted that right.

cient when "it reasonably identifies what is described." Nev.Rev.Stat. § 104.9108(1). A description reasonably identifies the collateral if it does so by specific listing, category, a type of collateral defined in the UCC, quantity, computational or allocational formula or procedure, or the collateral is objectively determinable. *Id.* § 104.9108(2). The test of sufficiency of a description is whether it makes "possible the identification of the collateral described." *Id.* § 104.9108 cmt. 2.

■ Under the Deed of Trust, South Edge conveyed "all contract rights, accounts, general intangibles, actions and rights in action relating to the Real Property or the Personal Property including, without limitation, all rights to insurance proceeds and unearned premiums arising from or relating to damage to the Real Property or the Personal Property." (Compl., Ex. D at 4.) Although "contract rights" could be a category of collateral if the relevant description reasonably identifies the contract rights at issue, South Edge was not a party to the Operating Agreement and therefore has rights to enforce it only if the Operating Agreement so provides. The Operating Agreement provides South Edge a right to recover in the event of a default of a Member or General Manager:

> Upon an Event of Default on the part of the General Manager or any Member, [South Edge],[9] acting by or through the General Manager or any Member, but in either case, only after authorization by the Management Committee (by affirmative vote of the Managers representing a majority of the Percentage Interests held by Members other than the Defaulting Party or by its Affiliate), may provide written notice of the Event of

Default (the "Default Notice") to the defaulting General Manager, Member or the defaulting unadmitted assignee of Units or Interests (either a "Defaulting Party"), and to [South Edge] and the non-defaulting Members and [South Edge] may exercise any remedies available to [South Edge] on account of such Event of Default provided in this Agreement or by law or in equity.

(Compl., Ex. B at 51 § 11.1.) The Operating Agreement thus grants South Edge enforcement rights, although pursuant to specific procedures, for Member defaults. Accordingly, if South Edge conveyed a security interest in these rights to Plaintiff, Plaintiff could enforce South Edge's rights under the Operating Agreement.

■ However, the Deed of Trust conveys South Edge's rights in the Operating Agreement only if those rights "relat[e] to the Real Property." "Relate" means "to show or establish a logical or causal connection between" or "to be in relationship." *Webster's Third New International Dictionary* 1916 (2002); *see also Xilinx, Inc. v. C.I.R.,* 567 F.3d 482, 490 (9th Cir.2009) (" 'related' means 'being connected or associated' ") (alteration omitted) (quoting *American Heritage College Dictionary* 1152 (3d ed. 2000)).

The Operating Agreement establishes the operating procedures for South Edge, of which the primary purpose is to provide a vehicle to bid on and develop the BLM land. (Compl., Ex B. at 1.) The Operating Agreement provides general operating provisions defining, for example, membership, allocation of profits and losses, management structure, formation of a business plan, member rights, accounting matters, and dissolution of the company. (*Id.* at 2,

---

**9.** This section refers to "the Company," which is defined in the Operating Agreement as South Edge. (Compl., Ex. B at 1.)

14, 18–23, 31–34, 42–44, 54.) These provisions are associated with South Edge's status as a limited liability company and are related to real property only because South Edge's business is real estate development. Moreover, unlike the security interests granted in the Acquisition Agreements via the Assignment of Acquisition Agreements or in permits, construction and labor contracts, and plans via the Assignment of Contracts, the Complaint and attached documents do not demonstrate a specific grant of a security interest in the Operating Agreement. Because the parties acknowledged the Operating Agreement in the Credit Agreement (Compl., Ex. A at 19), but never specifically assigned a security interest in the Operating Agreement to Plaintiff, it is questionable whether South Edge intended to assign such an interest or whether Plaintiff required such an assignment.

At the same time, the Operating Agreement provides specific provisions for developing Inspirada, such as determining the maximum bid for purchasing the property from the BLM, allocating the property among the Members and public sites, and planning and construction of major infrastructure. (Compl. Ex. B at 29, 37–38.) Additionally, the Members' capital contributions are issued in direct proportion to the acreage of Inspirada. (*Id.* at 5.) These provisions connect the Operating Agreement to the real property. The Members also amended the Operating Agreement to conform to the Credit Agreement, clarifying that South Edge was organized solely for acquiring, developing, and selling Inspirada, South Edge's only asset. (*Id.*, First Amendment at 1.) Further, upon default, Plaintiff noticed South Edge of defaults under the Operating Agreement, for which Plaintiff stated it had a right to collect for liabilities owed by the Members to South Edge, including under the Operating Agreement. (Compl., Ex. H.) Viewing the Complaint in the light most favorable to Plaintiff, whether the parties intended there to be a security interest in the Operating Agreement is a question of fact not suitable for determination at this stage of the proceedings.

■ The Operating Agreement relates, to some extent, to both real property and to South Edge's business operations. Because the broad "relating to the Real Property" language in the Deed of Trust is subject to more than one reasonable interpretation as related to the Operating Agreement, this language is ambiguous.[10] Although the Deed of Trust or another document might make possible the identification of the Operating Agreement, it is unclear whether that was the parties' intent. Viewing the Complaint and incorporated documents in the light most favorable to Plaintiff, the parties may have intended to form such a security interest. At the motion to dismiss stage, the Court will not foreclose the possibility that the parties intended to convey a security interest in the Operating Agreement. The Court therefore denies Defendants' Motion to Dismiss as to count one.

### B. Breach of Contract Against the Parents (Count 2)

Defendants argue count two as it relates to breach of contract and breach of the implied covenant of good faith and fair dealing fails because the Complaint does not allege the existence of a contract to

---

10. The Deed of Trust specifically states it is to be construed as though drafted jointly by the parties and no presumption favoring a party by virtue of authorship of the Deed of Trust shall arise. (Compl., Ex. D at 16.) Thus, the Court will not construe ambiguity in favor of either party.

which the Parents were a party. Plaintiff responds it alleged a contract because documents attached to the Complaint, e.g., the Acquisition Agreements, contain the Parents' signatures. Defendants reply that the Parents signed the Acquisition Agreements solely to acknowledge the Members' obligations under those contracts.

■■■■ Generally under Nevada law, "no one is liable upon a contract except those who are parties to it." *Albert H. Wohlers & Co. v. Bartgis,* 114 Nev. 1249, 969 P.2d 949, 959 (1998) (quotation omitted). Further, every contract contains an implied promise of good faith and fair dealing. *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.,* 107 Nev. 226, 808 P.2d 919, 923 (1991). As such, "[i]mplying a covenant of good faith and fair dealing presupposes the existence of a contract." *Alam v. Reno Hilton Corp.,* 819 F.Supp. 905, 910 (D.Nev.1993) (citing *Sands Regent v. Valgardson,* 105 Nev. 436, 777 P.2d 898, 899 (1989)).

■■■■ Although a claim for breach of the covenant of good faith and fair dealing exists in both contract and tort, a tort claim arises only in rare and exceptional cases where there is "a special element of reliance or fiduciary duty." *Great Am. Ins. Co. v. Gen. Builders, Inc.,* 113 Nev. 346, 354, 934 P.2d 257 (1997). The Nevada Supreme Court has denied tort liability for "certain relationships where agreements have been heavily negotiated and the aggrieved party was a sophisticated businessman." *Id.* at 355, 934 P.2d 257.

■■■■ As an initial matter, to the extent count two alleges a claim for tortious breach of the covenant of good faith and fair dealing, the claim fails. Here, all of the parties are experienced real estate developers or lenders, and the Complaint and numerous incorporated contracts demonstrate the agreements involving Inspirada were negotiated heavily. As such, no special element of reliance exists and count two fails to state a claim for tortious breach of the implied covenant of good faith and fair dealing.

The Acquisition Agreements and Assignment of Acquisition Agreements are the only contracts alleged in the Complaint that bear the Parents' signatures. Neither the Complaint nor the incorporated documents indicate the Parents were parties to any other contract. To the extent count two makes allegations based on contracts other than the Acquisition Agreements and Assignment of Acquisition Agreements, it fails to state a claim upon which relief can be granted. ·

■■■■ The Acquisition Agreements state the parties to those contracts are South Edge and the Members, but the Parents signed the documents as "Parent Co–Signer[s]." (Compl., Ex. C at 1, 34.) However, the Acquisition Agreements clarify that "[t]he [Member's] corresponding Parent Guarantor is co-signing this Agreement solely for the purpose of acknowledging [the Member's] rights and obligations hereunder." (*Id.* at 33.) This clause suggests the parties intended the Parents to co-sign only to acknowledge the Members had rights and obligations under the Acquisition Agreements. However, labeling a Parent as a "Guarantor" also suggests the Parents guaranteed the Members' obligations under the Acquisition Agreements.

The Assignment of Acquisition Agreements also bears the Parents' signatures. (Compl., Ex. F.) This agreement states it was entered into by South Edge and each Member and Parent in favor of Plaintiff. (*Id.* at 1.) The Assignment of Acquisition Agreements also states that South Edge and each Member entered into the Acquisition Agreements "cosigned by such Member's Parent Guarantor." (*Id.*) Describing the Parents as "Parent Guaran-

tors" suggests the parties intended that the Parents had a larger role than merely acknowledging the Acquisition Agreements. Because the parties' intent as to the Parents' role, if any, is not clear, the Court will not dismiss count two to the extent it is based on the Acquisition Agreements and the Assignment of Acquisition Agreements.

Accordingly, the Court grants Defendants' Motion to Dismiss as to count two to the extent it alleges a claim under contracts other than the Acquisition Agreements and the Assignment of Acquisition Agreements, as well as to the extent it alleges a claim for tortious breach of the covenant of good faith and fair dealing. However, the Court denies the motion as to count two in all other respects.

### C. Breach of Fiduciary Duty Against the Members and Parents (Count 3)

Defendants argue the breach of fiduciary duty claim fails because the Operating Agreement states the Members do not owe fiduciary duties to each other or South Edge and neither the Parents nor Members control South Edge and therefore do not owe a fiduciary duty to South Edge's creditors. Plaintiff responds that the Operating Agreement's waiver is invalid under Nevada law. Plaintiff also contends the Members and Parents owe South Edge's creditors a fiduciary duty because the Members and Parents directed South Edge's activities and South Edge is insolvent.

A claim for breach of fiduciary duty under Nevada law requires a plaintiff to demonstrate a fiduciary duty exists, that duty was breached, and the breach proximately caused the damages. *Brown v. Kinross Gold U.S.A., Inc.*, 531 F.Supp.2d 1234, 1245 (D.Nev.2008). " '[A] fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith.' " *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880–81 (9th Cir.2007) (quoting *Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238, 242 (1986)). The Complaint alleges Defendants owe a fiduciary duty to South Edge and to South Edge's creditors.

#### 1. Fiduciary Duty to South Edge

The Complaint alleges that "Defendants, as members and/or managers or controlling persons of [South Edge], owe fiduciary duties of loyalty to [South Edge] under applicable law." (Compl. ¶ 51.) However, the Operating Agreement states that "[w]ithout limiting the obligations of the Members under this Agreement or any agreement or document contemplated by this Agreement, neither the Members nor their respective Managers shall have any fiduciary duties to any other Member or Managers or [South Edge] or the General Manager." (Compl., Ex. B at 35 § 6.6.) The plain language of this provision demonstrates that all of the Members agreed they would not have fiduciary duties to South Edge.

Nevertheless, Plaintiff points to Nevada partnership law, under which a partnership agreement may not eliminate a duty of loyalty or unreasonably reduce the duty of care between partners or between the partners and the partnership. Nev.Rev.Stat. § 87.4316(2). The Nevada Revised Statutes do not specify such a restriction on an operating agreement of a limited liability company. *See* Nev.Rev. Stat. ch. 86. The Nevada Supreme Court has not addressed whether such a restriction nonetheless should be implied for limited liability companies.

Where a state court has not addressed an issue, the task of a federal

court is to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir.2005) (quotations omitted). In making that prediction, federal courts look to existing state law without predicting changes in that law. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir.2002). However, "federal courts are not precluded from affording relief simply because neither the state supreme court nor the state legislature has enunciated a clear rule governing a particular type of controversy or claim." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir.1994).

▬ Statutory interpretation is a question of law. *Sims v. Eighth Judicial Dist. Court ex rel. County of Clark*, 206 P.3d 980, 982 (Nev.2009). In Nevada, the goal of statutory interpretation is to ascertain the legislature's intent. *Karcher Firestopping v. Meadow Valley Contractors, Inc.*, 204 P.3d 1262, 1263 (Nev.2009). The Court must give a clear and unambiguous statute its plain meaning, unless doing so violates the spirit of the act. *D.R. Horton, Inc. v. Eighth Judicial Dist. Court ex rel. County of Clark*, 123 Nev. 468, 168 P.3d 731, 737 (2007). In doing so, the Court must consider a statute's provisions as a whole, reading them "in a way that would not render words or phrases superfluous or make a provision nugatory." *S. Nev. Homebuilders Ass'n v. Clark County*, 121 Nev. 446, 117 P.3d 171, 173 (2005) (quotation omitted). "Generally, when the legislature has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded." *Coast Hotels & Casinos, Inc. v. Nev. State Labor Comm'n*, 117 Nev. 835, 34 P.3d 546, 550 (2001); *see also S. Nev. Homebuilders*

*Ass'n*, 117 P.3d at 174 ("[I]t is not the business of this court to fill in alleged legislative omissions based on conjecture as to what the legislature would or should have done." (quotation omitted)).

The Nevada limited liability company statutes provide that a member is liable to a limited liability company for contributions that the member agreed to pay. Nev.Rev.Stat. § 86.391(1). A member also must hold as trustee any property that the member agreed to contribute to the company. *Id.* § 86.391(2). However, these liabilities can be waived "by the consent of all of the members." *Id.* § 86.391(3). Further, a limited liability company may adopt an operating agreement by the unanimous consent of the members. *Id.* § 86.286. These sections unambiguously provide certain liabilities for members and certain rules for an operating agreement, none of which suggest substantive restrictions on the content of the operating agreement as related to members' duties. Additionally, because the Nevada Legislature restricted the elimination of fiduciary duties for partnership agreements but not for limited liability company operating agreements, the Court will not fill in what the Nevada Legislature excluded.

Plaintiff points to the Revised Uniform Limited Liability Company Act, which has a provision stating that an operating agreement generally may not "eliminate the duty of loyalty, the duty of care, or any other fiduciary duty." Rev. Unif. Ltd. Liab. Co. Act § 110(c) (2006). However, neither the Nevada Legislature nor the Nevada Supreme Court has adopted such a provision. Further, in its 2009 session, the Nevada Legislature went in the opposite direction, amending Nevada law to allow an operating agreement to limit or eliminate "any and all liabilities for breach of contract and breach of duties of a member, manager or other person to a limited-liability company, to another member or

manager, or to another person that is a party to or is otherwise bound by the operating agreement."[11]  S.B. 350, 75th Leg. § 35 (Nev.2009) (amending Nev.Rev. Stat. § 86.286).  Although this provision does not take effect until October 1, 2009, it nonetheless suggests the Nevada Legislature's intent is to allow parties to a limited liability company's operating agreement to limit or eliminate fiduciary duties.

The Court therefore is satisfied that Nevada law does not prohibit members of a limited liability company from eliminating fiduciary duties owed to each other or the limited liability company.  Because the plain language of the Operating Agreement eliminates the Members' fiduciary duties to South Edge and Nevada law does not forbid such a provision, the Court will dismiss count three as to the Members for breaches of fiduciary duties to South Edge. Because no allegation or incorporated contract demonstrates the Parents are bound to act for the benefit of South Edge, count three also fails to state a claim for the Parents' breach of a fiduciary duty owed to South Edge.

### 2.  *Fiduciary Duty to Lenders*

■ The Complaint also alleges Defendants owe a fiduciary duty to Plaintiff and the other lenders.  Generally, "an arms-length lender-borrower relationship is not fiduciary in nature." *Yerington Ford, Inc. v. Gen. Motors Acceptance. Corp.,* 359 F.Supp.2d 1075, 1090 (D.Nev.2004) (applying Nevada law), rev'd on other grounds by *Giles,* 494 F.3d 865.  However, the Complaint states that "[b]ecause [South Edge] is insolvent, and therefore has fiduciary duties to creditors, Defendants, as controllers and managers of the insolvent [South Edge], also owe fiduciary duties to such creditors, including in this case, Plaintiff and other Lenders."  (Compl.

¶ 52.)  The Nevada Supreme Court has not determined whether such an insolvency exception applies in Nevada.

■ Under the corporate law of many states, directors of an insolvent corporation owe a fiduciary duty to the company's creditors.  *Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1005 (9th Cir.2005) (citing Delaware law); *see also, e.g., In re Jacks,* 266 B.R. 728, 737 (B.A.P. 9th Cir. 2001) (applying California law); *Dawson v. Withycombe,* 216 Ariz. 84, 163 P.3d 1034, 1058 (Ariz.Ct.App.2007); *N. Am. Catholic, Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101 (Del.2007).  *But see In re Eisaman,* 387 B.R. 219, 224 (Bankr.N.D.Ind.2008) (recognizing that Indiana does not make officers and directors of insolvent corporations fiduciaries for the corporation's creditors).  The insolvency exception is justified by the increased risk to creditors when a corporation becomes insolvent:

> In insolvency, creditors, as residual claimants to a definitionally-inadequate pool of assets, become exposed to substantial risk as the entity goes forward; poor decisions by management may erode the value of the remaining assets, leaving the corporation with even less capital to satisfy its debts in an ultimate dissolution.  The elimination of the stockholders' interest in the firm and the increased risk to creditors is said to justify imposing fiduciary obligations towards the company's creditors on the directors.

*Prod. Res. Group, L.L.C v. NCT Group, Inc.,* 863 A.2d 772, 791 (Del.Ch.2004).  The exception therefore "gives creditors of an insolvent firm standing to assert that directors breached their fiduciary duties by improperly harming the economic value of the firm, to the detriment of the creditors

---

**11.** However, an operating agreement cannot limit or eliminate liability "for any act or omission that constitutes a bad faith violation

of the implied contractual covenant of good faith and fair dealing."  S.B. 350, 75th Leg. § 35 (Nev.2009).

who had legitimate claims on its assets." *Smith,* 421 F.3d at 1005 (quotation omitted).

Although limited liability companies differ from corporations, the same policies of protecting creditors of insolvent corporations are applicable to the creditors of insolvent limited liability companies. Indeed, at least one court held that managers of an insolvent limited liability company owe a duty to the company's creditors. *In re McCook Metals, L.L.C.,* 319 B.R. 570, 595 (Bankr.N.D.Ill.2005). Because the justifications for the corporate insolvency exception are equally applicable to limited liability companies, the Court concludes the Nevada Supreme Court would extend the insolvency exception to limited liability companies.

█ Applying the exception here, the Complaint alleges South Edge is insolvent. (Compl. ¶ 52.) Further, the Complaint alleges Defendants controlled and managed South Edge and they breached their fiduciary duties "[b]y comprehensive and continuous use of their management control and vetoes over [South Edge's] performance." (*Id.* ¶¶ 52–53.) Although the Operating Agreement states that South Edge's management is vested exclusively with a management committee and that the "Members shall not have any right or power to take part in the management or control" of South Edge, the Operating Agreement also permits each Member to appoint one member of the management committee. (Compl., Ex. B at 18 ¶ 5.1.1, 32 ¶ 6.1.) Because the Members appoint the managers and the Complaint alleges that Defendant Parents and Members controlled South Edge's performance, it is possible that Defendants caused the managers of South Edge to breach fiduciary duties. Discovery therefore is necessary to determine the nature of the relationship between South Edge's managers, the Members, and the Parents. Plaintiff

therefore stated a claim in count three as it relates to an alleged breach of fiduciary duty owed to South Edge's lenders. Accordingly, the Court grants Defendants' Motion to Dismiss as to count three only as it relates to a breach of fiduciary duty owed to South Edge.

**D. Intentional Interference with Contractual Relations Against the Parents (Count 4)**

Defendants argue count four fails as to the Operating Agreement because Plaintiff is not a party or an intended beneficiary to the contract and as to the Acquisition Agreement because the Parents are privileged to interfere with the Members' contracts. Plaintiff responds that it is a secured creditor suing to enforce South Edge's claims under the Operating Agreement. Plaintiff also argues Nevada has not recognized a privilege always to interfere with a subsidiary's contracts, and, in any event, the privilege cannot be addressed on the pleadings.

█ Intentional interference with contractual relations requires the plaintiff to establish five elements: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett,* 119 Nev. 269, 71 P.3d 1264, 1267 (2003) (quotation omitted). Here, the Complaint alleges the Parents intentionally interfered with the contracts between the Members and South Edge. (Compl. ¶ 57.) The only contracts alleged to be between the Members and South Edge are the Operating Agreement and the Acquisition Agreements.

As to the Operating Agreement, as discussed above, the Court will not foreclose the possibility that the parties intended South Edge to grant Plaintiff a security

interest in the Operating Agreement. In accordance with such a security interest, Plaintiff could enforce South Edge's rights under the Operating Agreement. The Court therefore will not dismiss count four as it relates to the Operating Agreement.

██ As for the Acquisition Agreements, Defendants argue the Parents were privileged to interfere with the contracts of their subsidiaries. Although the Nevada Supreme Court has not applied this privilege, "courts across the country [have held] that a parent corporation has a privilege to interfere with the contracts of its wholly-owned subsidiary when the contract threatens a present economic interest of that subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose." *Truckstop.Net, L.L.C. v. Sprint Commc'ns Co.,* 537 F.Supp.2d 1126, 1140 (D.Idaho 2008) (citing cases); *see also MGP Ingredients, Inc. v. Mars, Inc.,* 465 F.Supp.2d 1109, 1114 (D.Kan.2006) (citing cases).

Even assuming the Nevada Supreme Court would adopt this privilege, Plaintiff nonetheless states a claim for intentional interference with the Acquisition Agreements. The Complaint states the Parents' "knowing and intentional interference with the contracts between Defendant Member and [South Edge] was intended to disrupt the contractual relationship between Defendant Member and [South Edge] and has resulted in a disruption of that relationship." (Compl. ¶ 58.) As such, the Complaint sufficiently alleges intent to state a claim for intentional interference with contractual relations. However, it is not clear from the Complaint whether the Parents allegedly intended to interfere with the agreements solely because it was in the best interests of the Members or for their own self-interest, because of some improper purpose, or for another reason. The Court therefore will allow the parties discovery to determine the Parents' intent.

Accordingly, the Court denies Defendants' Motion to Dismiss as to count four.

### E. Constructive and/or Resulting Trust Against the Members and Parents (Count 5)

Defendants argue count five is a disguised claim for damages and specific performance and fails to allege the elements of a constructive or resulting trust. Plaintiff responds that it is seeking a trust to safeguard funds recovered from Defendants, not specific performance, and it adequately alleged constructive and resulting trusts.

#### 1. Constructive Trust

██ "A constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it." *Locken v. Locken,* 98 Nev. 369, 650 P.2d 803, 804–05 (1982). In Nevada, the imposition of a constructive trust requires three elements: "(1) that a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." *Waldman v. Maini,* 195 P.3d 850, 857 (Nev.2008) (alteration and quotation omitted). Where a plaintiff can maintain an action at law and a legal remedy is adequate, resorting to equity is not appropriate. *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,* 440 F.Supp.2d 1184, 1197 (D.Nev. 2006) (citing *Davenport v. State Farm Mut. Auto. Ins. Co.,* 81 Nev. 361, 404 P.2d 10, 13 (1965)).

Here, Plaintiff requests a constructive trust for fees Defendants failed to pay under the Acquisition Agreements. (Compl. ¶¶ 61–62.) However, Plaintiff makes no factual allegations supporting the inadequacy of money damages. Because money damages will make Plaintiff

whole, a constructive trust is not essential to the effectuation of justice. The Court thus dismisses count five as it relates to constructive trust.

### 2. Resulting Trust

"A resulting trust exists where the acts or expressions of the parties indicate an intent that a trust relation results from their transaction." *Bemis v. Estate of Bemis,* 114 Nev. 1021, 967 P.2d 437, 441 n. 4 (1998). "If one pays all or part of the purchase price for land and the conveyance is made to another, the latter may hold upon a resulting trust for the former." *Werner v. Mormon,* 85 Nev. 662, 462 P.2d 42, 44 (1969). However where a loan was intended, a resulting trust does not arise. *Id.* (citing, *e.g.,* Restatement (Second) of Trusts § 445 ("Where a transfer of property is made to one person and the purchase price is advanced by another as a loan to the transferee, no resulting trust arises.")).

Here, no allegation indicates the parties intended a trust relationship from the transactions involved with the purchase and development of Inspirada. Instead, Plaintiff and the other lenders advanced money to South Edge to purchase the land in exchange for payment and other security interests. As such, count five fails to state a claim for a resulting trust. The Court therefore grants Defendants' Motion to Dismiss as to count five.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that the following motions are hereby GRANTED in part and DENIED in part: KB Home and KB Home Nevada Inc.'s Motion to Dismiss (2:08–CV–01711–PMP–RJJ (Base File), Doc. # 27); Coleman–Toll Limited Partnership and Toll Brothers, Inc.'s Motion to Dismiss (2:08–CV–01713–PMP–RJJ, Doc. # 24); Beazer Homes Holdings Corp. and Beazer Homes USA, Inc.'s Motion to Dismiss (2:08–CV–01715– PMP–RJJ, Doc. # 35); Pardee Homes of Nevada and Weyerhaeuser Real Estate Company's Motion to Dismiss (2:08–CV–01716–PMP–RJJ, Doc. # 24); and Meritage Homes of Nevada, Inc. and Meritage Homes Corporation's Motion to Dismiss (2:08–CV–01717–PMP–RJJ, Doc. # 28). The motions are granted as to count two to the extent it is based on contracts other than the Acquisition Agreements and Assignment of Acquisition Agreements and to the extent it alleges a claim for tortious breach of the covenant of good faith and fair dealing. The motions also are granted as to count three to the extent it alleges breach of fiduciary duty owed to South Edge and as to count five. The motions are denied in all other respects.